PEOPLE v ROSBOROUGH

OPINION OF THE COURT

1. CRIMINAL LAW—EVIDENCE—POLICE REPORTS—NOTES—CROSS-EXAMINATION.

Reports of police officers prepared at the end of a day's work must be accompanied by the fragmentary notes from which each report was prepared if the reports are to be allowed in evidence; only in this fashion will it be possible for defense counsel to proceed with a meaningful cross-examination of the officer.

2. CRIMINAL LAW—WITNESSES—NOTES—REFRESHING MEMORY.

To assume that a police officer has had his recollection refreshed by notes and is able to testify as if he had a present recollection of the many details contained in his notes is practically pure fiction where there have been a myriad of observations over days or weeks and where there has also been a considerable lapse of time between when the observations were made and the officer is called upon to testify.

---

REFERENCES FOR POINTS IN HEADNOTES

[1–4] 58 Am Jur, Witnesses § 594 *et seq.*
21 Am Jur 2d, Criminal Law § 339.
30 Am Jur 2d, Evidence §§ 876, 999 *et seq.*
[5, 6] 47 Am Jur, Searches and Seizures § 26.

3. CRIMINAL LAW—EVIDENCE—NOTES—POLICE REPORTS.

    The fragmentary notes of what a police officer observes and the report which is made from those notes should be treated as a single record of the events of the day; neither is complete without the other.

4. CRIMINAL LAW—EVIDENCE—NOTES—POLICE REPORTS—AUTHENTICATION—CROSS-EXAMINATION.

    The proper procedure to be followed in examining a police officer-witness about his observations made in surveillance over a period of time is to call him for such testimony as he is able to give from his present recollection and the judge may permit the witness to refer to the notes he took of what he observed to refresh his recollection; if his recollection cannot be refreshed, the fragmentary notes and the reports prepared on a day-to-day basis may be offered in evidence in the usual fashion as past recollection recorded; before they are received, they should be fully authenticated by the police officer, with opposing counsel afforded an opportunity to cross-examine as to authenticity; and if the notes and reports are received in evidence, the defense should be given an opportunity for full cross-examination with regard to them.

5. SEARCHES AND SEIZURES—WARRANT—AFFIDAVIT—SUFFICIENCY.

    An affidavit filed to obtain a search warrant must set forth facts and circumstances known to the affiant which constitute the grounds of the application, and not merely conclusions or information and belief, to be sufficient to justify the issuance of the warrant.

6. SEARCHES AND SEIZURES—WARRANT—SUPPRESSION—INSUFFICIENT AFFIDAVIT.

    A search warrant should have been suppressed where the affidavit on which it issued clearly did not meet the requirements for the issuance of a search warrant under the Michigan Constitution and holdings of the Michigan Supreme Court.

CONCURRING OPINION

WILLIAMS, J.

See Headnotes 1–6.

Appeal from Court of Appeals, Division 1, Lesinski, C. J., and Quinn and V. J. Brennan, JJ., affirming Recorder's Court of Detroit, Joseph A. Sullivan,

J. Submitted January 4, 1972. (No. 3 January Term 1972, Docket No. 52,918.) Decided March 9, 1972.

22 Mich App 410 reversed.

Myrene Rosborough and others were convicted of conspiracy to violate gambling laws. Defendants appealed to the Court of Appeals. Affirmed. Defendants appeal. Reversed, convictions vacated, and new trial ordered.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Patricia J. Boyle,* Assistant Prosecuting Attorney, for the people.

*Louisell & Gillis (Frank J. MacLean,* of counsel), for defendants.

ADAMS, J. On September 11, 1964, defendants were charged with conspiracy to violate the state gaming laws. The information charged violation of those laws in three counts over a period from July 15, 1964, up to and including August 5, 1964. At arraignment on May 20, 1965, all defendants stood mute and not guilty pleas were entered for them.

On August 5, 1964, a search warrant had issued for 5656 Lawton, Detroit. Numerous items of gambling and office paraphernalia, including a large quantity of mutuel tickets were seized. Motions to suppress evidence and quash the information on the basis that the warrant for 5656 Lawton and other warrants executed in the case were issued without probable cause, were filed on behalf of defendants

and denied on January 4, 1966. Defendants were found guilty on October 12, 1966. Upon appeal to the Court of Appeals, that Court affirmed the convictions. (22 Mich App 410.) Defendants' application for leave to appeal to this Court was granted. (384 Mich 792.)

Leave was granted in this case primarily to reexamine the holdings of this Court in *People* v *Hobson,* 369 Mich 189 (1963), and *People* v *Gorka,* 381 Mich 515 (1969). The controlling opinion in *Hobson,* written by Justice DETHMERS, was joined in by ·Justices KELLY and CARR. Justice BLACK concurred in the result. Justice SOURIS wrote a dissenting opinion in which he was joined by Justices T. M. KAVANAGH and OTIS SMITH. The DETHMERS' opinion affirmed the ruling of the trial court admitting into evidence various reports of police officers made over a period of time of their observations with regard to a gambling operation. As in this case, the officers made fragmentary notes each day. At the end of the day, a report was prepared from their notes and their memory of the day's events. The fragmentary notes made during the day were destroyed. The officers' reports were ruled to be admissible in evidence as past recollection recorded. The officers were called to testify and to be cross-examined as to the contents of the reports. Justice SOURIS' opinion contains a strenuous dissent on the grounds that defendants' constitutional right to confrontation and to effective cross-examination had been violated.

In *Gorka,* once again the situation was much the same as in *Hobson,* and as in this case. However, in *Gorka,* the reports were not admitted in evidence but were used to refresh the recollection of the police officers. This Court held that the reports prepared at the end of each day could be so used

and that the destruction of the fragmentary notes made during the course of the day did not deprive defendants of effective means of cross-examination.

In the present case, Officer Aldo Corso testified that he did not have any independent recollection as to any of the facts of his investigation and surveillance without referring to his notes. The prosecuting attorney, proceeding on the theory of *Hobson,* stated that he intended to offer the officer's reports into evidence. The court ruled them inadmissible, whereupon the following took place:

"*Mr. Sage* ·[*Assistant Prosecuting Attorney*]: Well, I would be glad to lay a further foundation as to whether or not we can refresh the witness's recollection.

"*The Court:* Well, refreshing it of course is a totally different thing. What the witness has indicated so far is that he has no independent recollection of the facts of this case without referring to his notes.

"*Mr. Sage:* That's true.

"*The Court:* Now, I would think that if that were true, the next step is to refer to the notes to see if it does refresh his recollection and if it does then to testify and the evidence then is the testimony given by the witness, not the document."

A recess was taken by the Court to give Officer Corso an opportunity to read his report. He was then questioned by the assistant prosecutor as follows:

"*Q.* After having read it, does it refresh your recollection as to the events that occurred and the things which you observed on that day from 12:00 noon on?

"*A.* Not in its entirety, no."

\*     \*     \*

"*Q.* (*By Mr. Sage*): In order to make these notes

which you indicated that you made, did you draw on just written memoranda or did you draw on something else?

"*A*. I also drew from memory in my own mind, what I saw that particular day and fragmentary notes that I had written down.

"*Q*. When did you write down or type up the notes in connection with your observations?

"*A*. When I wrote them down or when I typed them?

"*Q*. Well, let me ask you this: When did you type up the notes which you have there in your hand, People's Proposed Exhibit 1?

"*A*. Well, I came into the office at 4:30 or 5:00, whatever time it might have been. I typed them immediately.

"*Q*. The same day you made the observations?

"*A*. The same day, that's correct.

"*Q*. Your express purpose in making these notes was to help prepare the case for court?

"*A*. Yes, sir.

"*Mr. Sage:* I have no further questions. I might say that at this time I intend to use the notes which the officer has in his hand for the purpose that he might read them in as a past recorded recollection—past recollection recorded."

One of the attorneys for defendants objected, stating that he wished to see the original memoranda used by the officer to prepare his report in order to compare them with the report the prosecutor was offering in evidence. Thereupon the court took over as follows:

"*The Court:* I doubt that we need to get to the original memoranda or whatever you want to call the fragmentary notes.

"*Mr. Massey* [*attorney for defendants*]: I think that the—

"*The Court:* Excuse me. The witness has indicated that by looking at those observations they do refresh his recollection as to these events but not in their entirety. In other words, I gather he could testify in substance as to what his observations were by looking at that document and refreshing his recollection. There would be I take it certain details of the observation that would not be refreshed by looking at this memoranda and as to those he really wouldn't be refreshed in his recollection; is that correct, witness?

"*A.* That's correct, your Honor.

"*The Court:* In other words, I take it that if you read over your observations on the days in question, that you could probably put down the memorandum in substance as to what you saw; is that correct?

"*A.* That's correct.

"*The Court:* You might not remember a license plate or an exact time or color of dress of a person, that type of thing, but I take it that you would remember that on this day you followed Mary Doe No. 1 and saw her go into certain addresses and remain a few minutes and come out; is that right?

"*A.* Yes, sir, that's correct.

"*The Court:* Well, as I understand the witness's position, he doesn't need the document. Let me put it this way: There is no necessity to put the document in evidence because the witness could testify to substantially what happened based upon refreshing his recollection. When you talk about refreshing recollection, it doesn't matter whether you have the original document or copy of the document or a picture, a record. Anything that refreshes a witness's recollection may be used to refresh that recollection because it is not the picture or the document or the note or the paper that is the evidence but rather the testimony of the witness based upon a refreshed recollection.

"So in view of that, it seems to me we don't need to go into the question were there fragmentary or original notes destroyed or why they were destroyed. If the document is the evidence and is admitted as evidence under the past recollection recorded rule—

"*Mr. MacLean* [*attorney for defendants*]: Now, your Honor, I think that the rule of evidence—the original document is the best evidence. This is something that just happened. This man testified he has been here for years and been through other cases.

"*The Court:* Mr. MacLean, I don't think—either I am not making my position clear or you don't follow it. The original document is pertinent perhaps when you're speaking possibly of the best evidence but that deals with documentary evidence. When you speak of best evidence you are talking about a document that is the evidence. Now, in this case, the document is not the evidence. It is the testimony, the verbal testimony of this witness that is the evidence."

As a result of the court's ruling, the police officers were permitted to testify from their reports on the basis that their recollection had been refreshed. A few samples of the testimony of the police officers follow. The first excerpts are from the testimony of Officer Corso.

"*Q.* And can you recall what your first observation was that day without refreshing your recollection or do you have to refresh your recollection?

"*A.* As I stated before, I have to testify accurately and honestly. I would have to refer to my notes to give you the correct times, the correct type vehicle, the correct license number, and so on.

"*Q.* All right. And would you please look at your first day's notes on your first day's observation to see if you can refresh your recollection?

"*A.* As I stated earlier, I was in position at 12:00 noon in the vicinity of Blaine and Dexter. I was observing a 1956 Chevrolet, license number Adam Lincoln 3503. At 12:30 P.M., I observed a lady later identified as Janie Cade enter the Chevrolet, Adam Lincoln 3503 and she drove away. At this time I followed.

\* \* \*

"*Q.* What was the next day and date of your observations?

"*A.* Monday, July the 20th, 1964. And at 11:30 P.M. I took up—

"*The Court:* Excuse me. I don't like to interrupt but evidently I'm not getting my point across here to the witness or to counsel. It appears to me and I could be incorrect but it appears to me that the witness is simply reading verbatim from this document. Is that what you're doing, witness?

"*A.* Not verbatim, your Honor, but almost."

Sgt. William Hart's difficulty in recalling what happened can be seen from the following short excerpt from his testimony:

"*Q.* And after you arrived there, what did you observe? Now,—exhausting your memory as to what you recall without refreshing your recollection. Do you recall?

"*A.* Not accurately without reading what happened.

"*Q.* All right. Would you care to read it to see whether or not it refreshes your recollection?

"*A.* Yes, sir, I will. At 2:40 on that date while in the Dairy Bar I observed Iziac Rucker."

Later on in the testimony by Sgt. Hart, the following occurred:

"*Mr. Massey:* Your Honor, I would like to indicate that the man is reading from the book. He has it up there and is looking right at it.

"*The Court:*  Are you reading, witness?

"*A.* Yes, sir, I'm reading as I go so I won't get —this is a little involved, this particular thing here.

"*The Court:*  Well—

"*A.* I can tell it in my own words.

"*The Court:* That is exactly what we want you to do, tell it in your own words?

"*A.* All right, sir.   After Mr. Reginald Jones parked, Mr. William Jones then went to Mr. Reginald Jones' car where he gave him a brown paper bag and contents.

"*Q. (Mr. Sage):* All right.   Then what happened?

"*A.* After that entry, Mr. Reginald Jones left and went to the grocery store, Tip Top Grocery store.

"*Q.* Then what happened?

"*A.* After that—

"*Mr. Massey:* He's reading again, your Honor.

"*Mr. Sage:* I think he's entitled—

"*The Court:* He isn't reading because there is nothing being said.   He is referring to the document and I assume it is to refresh his recollection which is perfectly permissible.   If you have done that, witness, you may put it aside and testify."

Upon cross-examination, Sgt. Hart testified as follows:

"*A.* I was observing the vicinity of Roosevelt and McGraw at that time.   Now, you mean where specifically I was standing or sitting or—

"*Q.* Well, who did you see at that time?

"*A.* Well, I saw the people I described.

"*Q.* I mean what people?

"*A.* I couldn't tell you, sir.   That's been two years ago.

"*Q.* I mean to say you looked at your book just a little while ago?

"*A.* I refreshed my memory as to that time, yes, sir, as to when I was testifying and in order to give you an accurate answer I would have to refer to them again.   Then I could tell you perhaps.

"*Q.* In other words, you cannot do that as to any of these times, can you?

"*A.* Not independently without referring to my notes, no, sir."

Richard V. Smith, who was with the Detroit Police Department in 1964, and who testified for the people, likewise had difficulty in remembering the events in question. A sample of his testimony follows:

"*Q.* What was your next observation using your notes wherever necessary?

"*A.* At 1:29 PM, she parked on 30th Street near McGraw. She entered a house, 4547 McGraw. Approximately 6 minutes she was back to the car and she drove away and I continued to follow her. 1:38, she parked on 28th Street and she walked from my view. She was back to the car in 3 minutes and drove away and I continued to follow her. At 1:48 I saw her park on West Grand Blvd. near Milford and she walked to and entered several houses on the east side of the street, returning to the car at 2:30 P.M., driving away, and I continued to follow. 2:32 P.M. she parked on Vinewood near Scovel and she walked from my view and I noticed at 2:38 she returned to her car and drove away and I continued to follow. 2:52 PM, she parked on Roosevelt south of McGraw and she walked from my view. She was back to the car—

"*The Court:* Are you reading those, witness?

"*A.* Part of it, sir. Yes, sir."

*Hobson, Gorka,* and the present case present two troublesome and continuing problems. The first is the question of the destruction of the fragmentary notes made by the police officers while making their observations. The second is the correct way to treat the reports prepared at the end of each day by the

officers from their fragmentary notes and from their memory of the day's events.

We have searched the record in this case in vain for a satisfactory explanation as to why the fragmentary notes made each day by the police officers must be destroyed. We have been unable to find one.* We conclude that if the reports of the officers prepared at the end of a day's work are to be allowed in evidence, they must be accompanied by the fragmentary notes from which each report was

---

* This is the explanation of Lieut. Bullock with regard to the destruction of the fragmentary notes:

"*The Court:* Witness, the testimony in this case is that the prior witness on the stand, officer Corso, made notes at the scene which he said consisted of a license number and address and times. Are you familiar with that type of notes?

"*A.* Yes, sir, I am.

"*The Court:* Have you made similar notes yourself on other occasions?

"*A.* Yes, sir, I have.

"*The Court:* Is it a practice of your men to bring those notes and turn them over to you?

"*A.* Yes, sir, it is.

"*The Court:* Was that done in this case?

"*A.* Yes, sir, it was.

"*The Court:* By officer Corso?

"*A.* Yes, sir.

"*The Court:* What happened to those notes?

"*A.* Those fragmentary notes I burned, sir.

"*The Court:* You burned them?

"*A.* Yes, sir.

"*The Court:* Is that your usual practice?

"*A.* Yes, it is.

"*The Court:* Why do you burn them?

"*A.* For security reasons. They are not the original notes.

"*The Court:* No, witness, I didn't ask you that. That is a legal conclusion on your part which may possibly be incorrect. What information normally is on a typical note of that kind?

"*A.* Well, very limited information, your Honor. Usually a license number or a time. This is usually the only information that's there. There is no detailed information. Most of this is retained by the investigating officer and then he supplements the fragmentary notes that he has with the information that he has observed that day and then types them in note form. The fragmentary notes that he listed these license numbers or times are then turned over to me and I burn them.

"*The Court:* Do you have any available that could be typical fragmentary notes?

"*A.* No, sir, I have not."

prepared. Only in this fashion will it be possible for counsel for a defendant to proceed with a meaningful cross-examination of the officer.

The record in this case amply demonstrates the fact that in a matter of this kind, where there have been a myriad of observations over days or weeks and where there has also been a considerable lapse of time between when those observations were made and the officers are called upon to testify, it is practically pure fiction to assume that the officer has had his recollection refreshed by the notes and is able to testify as if he had a present recollection of the many details contained in the notes. It is perfectly understandable that during surveillance a police officer may be obliged to take only fragmentary notes of what he observes and, consequently, that he should, at the end of each day, prepare from those notes and his memory a coherent, detailed narrative of the day's events. What is not understandable is why the fragmentary notes should be destroyed for so-called security reasons. We conclude that the fragmentary notes and the report should be treated as a single record of the events of the day. Neither is complete without the other.

The proper procedure to be followed in future cases will be to call the officer for such testimony as he is able to give from his present recollection. The judge may permit him to refer to the notes to refresh his recollection. *Merrill* v *Leisenring,* 166 Mich 219, 227 (1911); *People* v *Johnson,* 215 Mich 221 (1921); 2 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 598, p 775. If his recollection cannot be refreshed, the fragmentary notes and the reports prepared on a day-to-day basis may be offered in evidence in the usual fashion as past recollection recorded. Before they are received, they

should be fully authenticated by the police officer, with opposing counsel afforded an opportunity to cross-examine as to authenticity. If the notes and reports are received in evidence, the defense should be given an opportunity for full cross-examination with regard to them.

On August 5, 1964, Officer Aldo Corso executed an affidavit for a search warrant for 5656 Lawton, Detroit. This affidavit (reproduced as an Appendix to this opinion) consists of a one-page printed form with various insertions typed in and three type-written pages setting forth observations of the officer. It will be noted that the printed form states that the officer has probable cause to believe that the premises for which the warrant was sought are used as and for a common gaming house. The basis for probable cause is stated in the printed form to be the fact that the officer is thoroughly familiar with all the methods and manners in which a mutuel numbers gambling enterprise is operated. The printed form also states that certain persons had been identified to the officer either by name or by description as participating in the operation of a mutuels gambling business. How this information was obtained by the officer or the reliability of the same is not stated.

The typewritten portion of the affidavit following the printed form details the observations of the officer with regard to various persons seen by him entering and leaving various premises. The only statements by the officer with regard to the activities of these persons, other than the fact that he saw them enter and leave various premises, are: "deponent saw him carrying a brown paper bag"; "he got out of the car carrying a large paper bag, and walk to and enter 5656 Lawton"; "deponent saw

Mary Doe No. 2 walk from the east carrying a large handbag and enter 5656 Lawton"; "he got out of the car carrying a package under his arm and entered 5656 Lawton"; "He got out of the car carrying a package under his right arm and entered 5656 Lawton."

The officer then concludes "that from his observations of the people, packages and parcels in the manner described, and the use of the automobiles hereinbefore mentioned, that the persons aforementioned, whose names are unknown but whose persons are well known, have conspired to violate the gambling laws of the State of Michigan, and that they are operating an unlawful gambling enterprise and that the premises are used to collect, store and conceal memoranda of bets and other gambling paraphernalia  *   *   * ."

The use of a printed form was condemned by this Court in *In the Matter of Sarah Way,* 41 Mich 299, 301 (1879).

In the case of *People* v *Effelberg,* 220 Mich 528 (1922), an affidavit with striking similarity to the one in this case was considered by Justice CLARK, writing for the whole Court. He states (p 531):

"Rejecting the parts of the complaint avowedly stated on information and belief, there remain the following:

" 'Which said premises are occupied by one George Effelberg as a public place where liquors are manufactured and furnished and possessed.  *   *   *

" 'Wine, whisky, etc.,  *   *   * are being manufactured and possessed for the purpose of being sold, furnished or given away as a beverage, contrary to the provisions of Act No. 338 of the Public Acts of the State of Michigan for the year 1917, as amended.
*   *   *

" 'Numerous persons frequent the said building at various times of night and daytime unlawfully. * * *

" 'That intoxicating liquors are sold there and given away unlawfully.'

"In each of the statements just above quoted, the affiant attempts to find and determine the ultimate fact that a violation of the law had been committed. It was not for him but for the magistrate to determine whether there was probable cause to justify issuing the search warrant. His statements are his conclusions and have no more force than if expressly stated on information and belief. Affiant should have stated to the magistrate on oath or affirmation the facts and circumstances, if any were known to him, which induced the beliefs and the conclusions stated."

See, also, *People* v *Knopka,* 220 Mich 540 (1922).

The requirement for a search warrant is stated as follows by this Court in *People* v *Fons,* 223 Mich 603, 606 (1923):

"The warrant does not issue from the mere fact of the filing of an affidavit, but from the finding of good cause based on legal evidence. The law contemplates a showing before a magistrate, such a showing as satisfies him that a crime has been committed."

In *People* v *Moten,* 233 Mich 169, 171 (1925), this Court stated:

"It is settled law in this jurisdiction and generally elsewhere that an affidavit for a search warrant made only on information and belief is insufficient to move the judicial discretion of the issuing officer. It must also contain, as distinguished from mere conclusions or belief, known material facts directly stated as affiant's grounds for such belief."

2 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 868, p 1129, states:

"The affidavit must contain facts within the knowledge of the affiant, as distinguished from mere conclusions or belief. An affidavit made on information and belief is not sufficient. The affidavit should clearly set forth the facts and circumstances within the knowledge of the person making it, which constitute the grounds of the application. The facts should be stated by distinct averments, and must be such as in law would make out a cause of complaint. *It is not for the affiant to draw his own inferences. He must state matters which justify the drawing of them.*" (Emphasis added.)

In view of the fact that the affidavit in this case clearly does not meet the requirements for the issuance of a search warrant under the Michigan Constitution and holdings of this Court with regard to the same, it is scarcely necessary to consider Federal requirements also controlling upon the states under the Fourteenth Amendment. It is sufficient to note that in *Spinelli* v *United States,* 393 US 410; 89 S Ct 584; 21 L Ed 2d 637 (1969), the affidavit was found to be insufficient for failure to give information why the informant could be found to be reliable and because the FBI surveillance did not independently suggest criminal conduct. In that case, it was held that various trips to and from an apartment and the fact that it was shown to have two telephones were insufficient facts to ripen into a judgment that a crime was probably being committed. As Justice White, in his concurring opinion, stated (p 423):

"But if the officer simply avers, without more, that there is gambling paraphernalia on certain premises, the warrant should not issue, even though the belief of the officer is an honest one, as evidenced by his oath, and even though the magistrate knows

him to be an experienced, intelligent officer who has been reliable in the past."

The search warrant should have been suppressed. Other issues raised by defendants upon this appeal need not be considered in view of our disposition of this case. The convictions of defendants are vacated and a new trial is ordered.

T. M. KAVANAGH, C. J., and BLACK, T. E. BRENNAN, T. G. KAVANAGH, and SWAINSON, JJ., concurred with ADAMS, J.

## APPENDIX

STATE OF MICHIGAN ⎞ SS.
COUNTY OF WAYNE  ⎠

*The affidavit and complaint on oath and in writing of* ALDO CORSO *of the* City *of Detroit, County of Wayne, and State of Michigan, taken and made before me* HONORABLE JOHN P. O'HARA, JUDGE OF RECORDER'S COURT *of the City of* Detroit, Wayne County, Michigan, *and a Magistrate, upon the* 5th *day of* August, *A.D. 1964, who by me being duly sworn, says that he has probable cause to believe and does believe that the premises located at* 5656 Lawton, two story imitation brick dwelling, City of Detroit, Wayne County, Michigan.

*County and State aforesaid, used or occupied by* JULIUS SIMMONS, ROBERT WILLIAMS, THELBERT JEFFRIES, REGINALD JONES, WILLIAM TUCKER, MAN KNOWN AS MR. RUCKERS, AND JOHN DOE No. 1, JOHN DOE No. 2, JOHN DOE No. 3, MARY DOE No. 1, MARY DOE No. 2, MARY DOE No. 3, and MARY DOE No. 4.

*is used as and for a common gaming house, for gaming for money or other property, is use for promoting the game known as a policy lottery or policy and*

*is used for the buying or selling of pools or regis-
tering of bets upon any race, game, contest, act or
event and that persons resort thereto for such pur-
poses, and that the grounds of his belief are as
follows:*

*The deponent is a* Patrolman of the Vice Bureau,
Detroit Police Department; *that during the occur-
rences herein set forth he was and still is assigned
to the investigation and suppression of mutuel num-
bers gambling enterprises; that the said enterprises
are operated by the accepting by a writer of bets
from a player, the delivery to him of a copy of the
memoranda of bet and the delivery to the pickup
man of a copy of the bet, who in turn delivers them
by divers means to the house where they are tabu-
lated, the winning tickets selected and the winners
paid at the rate of approximately five hundred to
one, with certain numbers excepted on which the rate
is three hundred to one; that at the present time the
deadline or the time by which all bets must have been
made is* 4:01 *P.M., and that this business is carried
on in various places throughout the City of Detroit,
County of Wayne, and*                            ,

*State of Michigan, in private homes, grocery stores,
barber shops, gasoline stations, factories and upon
the public highways; that the operators of said un-
lawful enterprise work secretly and are very cau-
tious in order to avoid observation and prosecution;
that deponent has been a member of the said law
enforcement agency for some time past, and has
devoted a considerable portion of his time to the
suppression of this type of activity, so that he is
thoroughly familiar with all the methods and man-
ners in which this enterprise is operated;*

*That on various dates beginning with the* 15th *day
of* July, A. D., 1964, *this deponent has made contin-
ued observations concerning the operation of a mu-
tuel's gambling house within the City of Detroit,
County of Wayne,*

*State of Michigan, and certain persons have been
identified to him either by name or by description as
participating in the operation of this mutuels gam-
bling business either as house-men, pickup men, writ-
ers or collectors and that pursuant to this informa-
tion he has made a number of observations which
are more particularly hereinafter set forth:*
That on Saturday, August 1, 1964, at 11:45 a.m.
deponent began making observations in the vicinity
of Blaine and Dexter, in the City of Detroit, Wayne
County, Michigan and at 12:15 p.m. he saw Mary
Doe No. 1 exit a house on the north side of Blaine
west of Dexter and entered a 1956 Chevrolet License
No. AL 3503, and drove away. The deponent fol-
lowed at 12:24 p.m. the deponent saw her park the
Chevrolet AL 3503 on Broad Street south of Kay
where she got out of the car and entered 9326 Broad
Street. She came out of this address in two minutes
and then walked to a house on the west side of Broad-
street out of deponent's view. At 12:31 P.M. de-
ponent saw her return to the Chevrolet License AL
3503 and drive away with deponent following. At
12:45 p.m. deponent saw her park the Chevrolet AL
3503, on Scovel east of Vinewood, where she got out
of the car and entered 3747 Scovel. At 12:50 p.m.
deponent saw her return to the Chevrolet License
AL 3503 and drive away with the deponent follow-
ing. At 12:55 p.m. deponent saw her park on Moore,
west of Roosevelt and enter a house on the south
side of Moore. Deponent saw her come out of this
location and then walk to a house on the north side
of Moore out of the deponent's view. At 1:03 p.m.
deponent saw her return to the Chevrolet License
AL 3503 and drive away with the deponent follow-
ing. At 1:10 p.m. deponent saw her park a Chevro-
let License AL 3503 on 28th street south of
McGraw. Deponent saw her enter 5447-49 28th
Street. At 1:13 p.m. she returned to the Chevrolet
AL 3503 and drove away with the deponent follow-
ing her. At 1:14 p.m. deponent saw her park the

Chevrolet AL 3503 on 30th street north of McGraw
where she got out of the car and entered 4547 Mc-
Graw.  At 1:18 p.m. deponent saw her enter the
Chevrolet AL 3503 and drive away with deponent
following her.  At 1:23 p.m. deponent saw her park
the Chevrolet AL 3503, on 28th Street north of Mc-
Graw where she walked from the deponent's view.
At 1:26 p.m. deponent saw her return to the Chev-
rolet AL 3503, where she drove away and the depo-
nent followed her.  At 1:33 p.m. deponent saw her
park the Chevrolet AL 3503, on West Grand Blvd.
north of Milford where she got out of the car and
entered several houses on the east side of the street.
At 2:10 p.m. deponent saw her return to the Chev-
rolet AL 3503, where she drove away and the depo-
nent followed her.  At 2:11 p.m. deponent saw her
park the Chevrolet AL 3503, on Scovel at Vinewood
walk to a house on the west side of Vine wood from
the deponent's view.  At 2:25 p.m. she returned to
the Chevrolet AL 3503, and drove away with the
deponent following her.  At 2:31 p.m. deponent saw
her park the Chevrolet AL 3503 on Roosevelt south
of McGraw, where she entered the Tip-Top Market,
located at 5601 Roosevelt.  At 2:33 p.m. deponent
saw her return to the Chevrolet AL 3503 and drive
away.  The deponent remained to observe this lo-
cation.  At 2:55 p.m. deponent saw John Doe No. 1
park the Ford License No. FZ 2625 on Roosevelt at
Hudson, and walk to and enter the Tip Top Market.
At 3:03 p.m. deponent saw him carrying a brown
paper bag as he left 5601 Roosevelt and entered the
Ford FZ 2625 and drove away with the deponent
following him.  At 3:10 p.m. deponent saw John Doe
No. 1 park the Ford FZ 2625, on Hudson at Mis-
souri.  He remained in the car for about one minute
and then got out of the car and entered 5656 Lawton,
in four minutes the deponent saw him return to the
Ford FZ 2625 and drive away.  The deponent re-
mained to observe this location.

At 3:26 p.m. deponent saw Mary Doe No. 2 walking from the north and entered 5656 Lawton. At 3:33 p.m. deponent saw Mary Doe No. 3 walking from the south and enter 5656 Lawton. At 3:40 p.m. deponent saw Robert Wiliams walking from the north and enter 5656 Lawton. At 4:00 p.m. the deponent discontinued his observations for this date.

On Monday, August 3, 1964, at 11:30 a.m. deponent began making observations in the vicinity of Blaine and Dexter, is in the City of Detroit, Wayne County, Michigan, And at 12:15 p.m. deponent saw Mary Doe No. 1 enter the Chevrolet AL 3503, and drive away with the deponent following her. At 12:21 p.m. deponent saw her park on Broadstreet, south of Kay, where she got out of the car and entered 9326 Broadstreet. At 12:28 p.m. deponent saw her return to the Chevrolet AL 3503, and drive away with the deponent following her. At 12:32 p.m. deponent saw her park in the driveway of 9514 Yosemite and enter this address. At 12:47 p.m. deponent saw her return to the Chevrolet AL 3503, and drive away with the deponent following her. At 12:59 p.m. deponent saw her park on Scovel east of Vinewood, and she got out of the car, and entered 3747 Scovel. At 1:10 p.m. she returned to the Chevrolet AL 3503, and drove away. At 1:15 p.m. the deponent took up a position at W. Grand Blvd. and Milford. At 1:55 p.m. deponent saw Mary Doe No. 1 park the Chevrolet AL 3503, on W. Grand Blvd. north of Milford, and entered several homes on the east side of W. Grand Blvd. At 2:26 p.m. deponent saw her return to the Chevrolet AL 3503, and drive away with the deponent following her. At 2:28 p.m. deponent saw her park on Vinewood south of Scovel where she got out of the car and walked south on Vinewood from deponent's view. At 2:46 p.m. deponent saw her return to the Chevrolet AL 3503, and drive away with the deponent following her. At 2:50 P.M. the deponent saw park on Roosevelt south of McGraw where she got out of the car and

entered the Tip Top Market, located at 5601 Roosevelt. At 2:52 p.m. she returned to the Chevrolet AL 3503, and drove away. The deponent remained to observe this area. At 3:00 p.m. deponent saw John Doe No. 1 park the Ford FZ 2625, in front of 3629 McGraw, Ruckers Dairy Bar, and enter this address, At 3:02 p.m. deponent saw him walk out of this address and enter the Tip Top Market, 5601 Roosevelt. At 3:05 p.m. deponent saw him walk out of this address and enter the Ford FZ 2625 and drive away with the deponent following. At 3:12 p.m. deponent saw him park on Hudson at Missouri where he got out of the car carrying a large paper bag, and walk to and enter 5656 Lawton. At 3:18 p.m. deponent saw him return to the Ford FZ 2625, and drive away. The deponent remained to observe 5656 Lawton. At 3:14 p.m. the deponent saw Robert Williams walk from the north and enter 5656 Lawton. At 3:24 p.m. deponent saw Mary Doe No. 2 walk from the east carrying a large handbag and enter 5656 Lawton. At 3:31 p.m. deponent saw Reginald Jones park a Thunderbird, ZR 4088, on Hudson west of Grand River. He got out of the car carrying a package under his right arm and entered 5656 Lawton. At 4:30 p.m. the deponent discontinued his observations for this date.

On Tuesday, August 4, 1964, at 11:30 a.m. deponent began making observations in the Vicinity of Blaine and Dexter, in the City of Detroit, Wayne County, Michigan, and at 12:30 p.m. saw Mary Doe No. 1 enter the Chevrolet AL 3503, and drive away with the deponent following her. At 12:34 p.m. deponent saw her park on Broadstreet south of Kay where she got out of the car and entered 9326 Broadstreet. At 12:46 p.m. she returned to the Chevrolet AL 3503, and drove away with the deponent following. At 12:50 p.m. deponent saw her park in a driveway at 9514 Yosemite and enter this address. At 1:01 p.m. deponent saw her return to the Chevrolet AL 3503, and drove away with the deponent following.

At 1:15 p.m. deponent saw her park on Scovel east of Vinewood, where she got out of the car and entered 3747 Scovel. At 1:18 p.m. deponent saw her return to the Chevrolet AL 3503, and drive away with the deponent following her. At 1:23 p.m. deponent saw her park on 28th street south of McGraw and she entered 5447-49 28th Street. At 1:33 p.m. deponent saw her return to the Chevrolet AL 3503, and drive away with the deponent following. At 1:34 p.m. deponent saw her park on 30th Street north of McGraw where she entered 4547 McGraw. At 1:39 p.m. deponent saw her return to the Chevrolet AL 3503, and drive away, with the deponent following her. At 1:44 p.m. deponent saw her park on W. Grand Blvd. north of Milford where she got out of the car and entered several homes on east side of W. Grand Blvd. At 2:16 p.m. deponent saw her return to the Chevrolet AL 3503 and drive away, deponent following her. At 2:18 p.m. deponent saw her park on Vinewood south of Scovel where she got out of the car and walk south on Vinewood from deponent's view. At 2:30 p.m. she returned to the Chevrolet AL 3503, and drove away with the deponent following. At 2:34 p.m. deponent saw Mary Doe No. 1 park on Roosevelt south of McGraw where she got out of the car and entered the Tip Top Market, located 5601 Roosevelt. At 2:37 p.m. deponent saw her return to the Chevrolet AL 3503 and drive away. The deponent remained to observe this area. At 2:48 p.m. deponent saw John Doe No. 1 park the Ford FZ 2625, just west of 3629 McGraw, Ruckers Dairy Bar, and then enter this address. At 2:51 p.m. deponent saw him return to the Ford FZ 2625 and drive away, with the deponent following. At 2:53 p.m. deponent saw him park in front of 5601 Roosevelt, Tip Top Market, where he intered this address. At 3:00 p.m. deponent saw him return to the Ford FZ 2625, and drove away with the deponent following. At 3:06 p.m. deponent saw him park on Hudson at Missouri, where he got out

of the car carrying a package under his arm and entered 5656 Lawton. The deponent remained to observe 5656 Lawton. At 3:12 p.m. deponent saw Mary Doe No. 2 and Mary Doe No. 3 walk from the east and enter 5656 Lawton. At 3:23 p.m. deponent saw Reginald Jones park the Thunderbird ZR 4088, west of Grand River on Hudson. He got out of the car and entered 5656 Lawton. At 4:30 p.m. the deponent discontinued his observations of this date.

Deponent further says that from his observations of the people, packages and parcels in the manner described, and the use of the automobiles hereinbefore mentioned, that the persons aforementioned, whose names are unknown but whose persons are well known, have conspired to violate the gambling laws of the State of Michigan, and that they are operating an unlawful gambling enterprise and that the premises are used to store, collect and conceal memoranda of bets and other gambling paraphernalia; and that the premises are used for the registering of bets upon an uncertain event; and that all of these observations were made in the City of Detroit; Wayne County.

WHEREFORE, this complainant prays for the issuance of a search warrant to make search for said gambling paraphernalia at the address above-described, according to the statute in such case made and provided;

Further deponent says not.

s/s Aldo Corso

_____

ALDO CORSO

Subscribed and sworn to before me this 5th day of August, A. D. 1964.

s/s John P. O'Hara

_____

JUDGE of the Recorder's Court of the City of Detroit, Wayne County, Michigan, and a Magistrate.

WILLIAMS, J. (*concurring*).  I agree with the result and reasoning of my Brother ADAMS's opinion. However, I believe it would be helpful to illustrate the missing link to sufficiency in probable cause for the search warrant sought.

The activity described in the typed pages attached to the affidavit for a search warrant narrate minutely what could very well be an illegal gambling operation.  But it is also possible that it could be innocent activity.  To the specialist the illegal character may seem overwhelming, but something further is needed to connect this ambiguous activity to illegality for the search warrant issuing authority.

My Brother ADAMS refers in his opinion to allegations on the printed page of the affidavit for a search warrant, which could, if supported by proper evidence, serve as such a connector, namely "that certain persons had been identified to the officer either by name or by description as participating in the operation of a mutuels gambling business" assuming such persons were all or some of those described in the succeeding typewritten narrative. But my Brother ADAMS properly observed "How this information was obtained by the officer or the reliability of the same is not stated."

Likewise such connector could be the purchase of a "numbers ticket" or any similar evidence of sale or traffic at any of the many stops so minutely described.