SPONICK v DETROIT POLICE DEPARTMENT

RICKARD v DETROIT POLICE DEPARTMENT

DAUGHERTY v DETROIT POLICE DEPARTMENT

1. ADMINISTRATIVE LAW—POLICE COMMISSIONER—RULE-MAKING POWER.

A rule of the Detroit Police Department proscribing any act or conduct "not specifically mentioned in the rules and regulations which tends to bring the department into disrepute or reflects discredit upon the individual as an officer" is too vague to be valid and is an invalid exercise of the police commissioner's authority to "make all proper rules for the government and discipline of the department" because the rule gives no fair warning of the conduct it proscribes and presents a standard or guide so impalpable as to be no standard at all (Detroit Charter, Title 4, ch 21 § 5[a]; Detroit Police Manual, ch 3, § 34[8]).

2. ADMINISTRATIVE LAW—RULE-MAKING POWER—CONSTITUTIONAL LAW—VAGUENESS.

A rule of the Detroit Police Department proscribing knowing and intentional association, except in the line of duty, with persons convicted, charged or suspected of any crime other than traffic

REFERENCES FOR POINTS IN HEADNOTES

[1–4, 6, 8–10, 13, 14, 31, 32] 2 Am Jur 2d, Administrative Law § 289 *et seq.*

[5] 16 Am Jur 2d, Constitutional Law § 355.

[7] 16 Am Jur 2d, Constitutional Law § 302.

[11] 2 Am Jur 2d, Administrative Law §§ 407–409.

[12] 2 Am Jur 2d, Administrative Law §§ 410–413.

[15, 16, 19] 2 Am Jur 2d, Administrative Law § 439.
  29 Am Jur 2d, Evidence § 296.

[17] 2 Am Jur 2d, Administrative Law § 424.

[18–20] 2 Am Jur 2d, Administrative Law § 393 *et seq.*

[20–22] 29 Am Jur 2d, Evidence § 428 *et seq.*

[23, 24] 2 Am Jur 2d, Administrative Law §§ 683, 688.

[25] 2 Am Jur 2d, Administrative Law § 434 *et seq.*

[26, 28, 29] 2 Am Jur 2d, Administrative Law § 443 *et seq.*

[27] 2 Am Jur 2d, Administrative Law §§ 547–549.

[30] 16 Am Jur 2d, Constitutional Law § 177.

offenses and municipal ordinance violations gives fair warning of the conduct proscribed and is not unconstitutionally vague and uncertain because: from the face of the regulation it can be readily ascertained that arrest and conviction records are included within the meaning of the regulation, that all felonies and many misdemeanors are also included, and that a single arrest or conviction constitutes a "criminal record"; an individual officer must know that the individual has been convicted of, is charged with, or is suspected of some crime; it is fairly within the apparent meaning of the regulation that no time limit be placed on prior criminal activity; and the word "associate" means more than "incidental contacts" between police officers and known criminals and means to join for a particular purpose as "a partner, fellow worker, colleague, friend, companion or ally" (Detroit Police Manual, ch 3, § 34[41]).

3. CONSTITUTIONAL LAW—REGULATION—OVERBREADTH.

Statutes and administrative regulations which are precise and which do accomplish some legitimate governmental end are, nevertheless, unconstitutional if they "broadly stifle fundamental personal liberties when the end can be more narrowly achieved".

4. ADMINISTRATIVE LAW—REGULATION—POLICE DEPARTMENTS—CONDUCT OF OFFICERS—ASSOCIATIONS WITH CRIMINALS.

There is no question that the Detroit Police Department has the authority to regulate the conduct, both on and off duty, of its officers in an effort to preserve the integrity of the department and of its individual officers and the public's confidence in the department, nor is there question about the propriety of restraining police officers' associations with known or reputed criminals, since some such associations may expose an officer to irresistible temptation to yield in his obligation to impartially enforce the law and some such associations may give the appearance that the community's police officers are not themselves honest and impartial enforcers of the law.

5. CONSTITUTIONAL LAW—FREEDOM OF SPEECH—FREEDOM OF ASSOCIATION—CIRCUMSCRIPTIONS OF FREEDOM.

Freedom of association is closely allied to freedom of speech and, as such, lies at the foundation of a free society and is protected by the First and Fourteenth Amendments to the Constitution of the United States; that freedom may not be denied to an individual or unreasonably limited merely because he has chosen public employment as a police officer but may be circumscribed only as reasonably and narrowly related to the

effective performance of a police officer's duties (US Const, Am I, XIV).

6. ADMINISTRATIVE LAW—REGULATION—POLICE DEPARTMENTS—CONDUCT OF OFFICERS—ASSOCIATIONS—CONSTITUTIONAL LAW.

A rule of the Detroit Police Department proscribing knowing and intentional association, except in the line of duty, with persons convicted, charged, or suspected of any crime other than traffic offenses and municipal ordinance violations is constitutionally infirm because some of the associations proscribed have no possible bearing on the integrity of a police officer and that of his department, have no possible bearing on the public's confidence in the police and unnecessarily restrict police officers' fundamental right to associate freely, since the regulation not only proscribes associations with persons recently convicted or currently suspected of some crime but also proscribes a police officer's association with a neighbor or fellow church member arrested once decades ago or befriending a recently convicted individual and helping him become a productive citizen, which could not possibly impugn a police officer's integrity (Detroit Police Manual, ch 3, § 34[41]).

7. CONSTITUTIONAL LAW—REGULATION—STANDING—FIRST AMENDMENT RIGHTS.

The principle that a person to whom a statute or regulation may constitutionally be applied will not be heard to challenge that statute or regulation on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court, is embedded in the traditional rules governing constitutional adjudication; however, in the First Amendment area, the traditional rules of standing have been loosened to permit attacks on overly broad statutes and regulations with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite specificity, provided that the overbreadth is not only real, but substantial as well, judged in relation to the statute's or regulation's plainly legitimate sweep (US Const, Am I).

8. ADMINISTRATIVE LAW—REGULATION—POLICE DEPARTMENTS—CONDUCT OF OFFICERS—REPORTS—CONSTITUTIONAL LAW—VAGUENESS.

A rule of the Detroit Police Department requiring every police officer to file a written report within 24 hours of all deliberate contacts with persons he knows to be convicted, charged, or suspected of any crime other than minor misdemeanors and all

deliberate visits to places frequented or suspected of being frequented by such persons fairly informs all Detroit police officers what and when they must report to their superiors and is not unconstitutionally vague (Detroit Police Manual, ch 4, § 73).

9. ADMINISTRATIVE LAW—REGULATION—POLICE DEPARTMENTS—CON-
DUCT OF OFFICERS—ASSOCIATIONS—REPORTS—CONSTITUTIONAL
LAW—OVERBREADTH.

A rule of the Detroit Police Department requiring, under threat of departmental discipline, every police officer to file a written report within 24 hours of all deliberate contacts with persons he knows to be convicted, charged, or suspected of any crime other than minor misdemeanors and all deliberate visits to places frequented or suspected of being frequented by such persons is no less obvious a restraint on that officer's personal freedom of association than is a regulation prohibiting such associations, since a police officer might choose to curtail his innocent involvement with others rather than publicize those involvements or rather than take the time to record such involvements, and is unconstitutionally overbroad; while a recording requirement is somewhat less of a restraint on the freedom of association than is an outright prohbition, since the rule deals with encounters less than "associations" with convicted, charged, or suspected criminals prohibited by a regulation held unconstitutional, on balance, the constitutional infirmities of the two regulations are comparable (Detroit Police Manual, ch 3, § 34[41]; ch 4, § 73).

10. STATUTES—CITY CHARTER—ADMINISTRATIVE LAW—POLICE COMMIS-
SIONER—TRIAL BOARD—AUTHORITY.

The Detroit City Charter provision authorizing the police commissioner to "change the title of police officers and employees under him, except deputies", to designate such new title as he sees fit, and to create "whatever offices and positions" he deems "necessary for the proper organization and conduct of the department" and granting him "such other powers as * * * may be necessary * * * for the proper discharge of his duties", one of which is the maintenance of discipline, authorizes the commissioner to either abolish the office of chief inspector or to reasonably compensate for a vacancy in that office for purposes of constituting a trial board; the appointment by the police commissioner of a district inspector or the director of administrative services to sit on a trial board authorized by the Detroit City Charter does not violate the charter provision that the board shall consist of, among others, the chief inspector of the

department and does not deprive the trial board of authority to adjudicate charges of police misconduct and to discipline officers where there was no chief inspector of the department at the time of the proceedings (Detroit Charter, Title 4, ch 21, §§ 5[a], 5[d], 5[m], 16).

11. ADMINISTRATIVE LAW—CONSTITUTIONAL LAW—DUE PROCESS—HEARING BOARD—COMPOSITION.

Administrative hearings need not be conducted by a judicial officer or even by the traditional "neutral magistrate", and due process is satisfied if the hearing is conducted by someone who did not participate in the decision under review; it is neither a denial of due process nor a violation of the common law principle that "no man shall be judge in his own cause" for a trial board composed exclusively of police officers to judge charges of misconduct prosecuted against a fellow officer of the department so long as no individual member of the trial board has a direct financial interest in the outcome of the cause.

12. ADMINISTRATIVE LAW—CONSTITUTIONAL LAW—APPEAL AND ERROR—DUE PROCESS—DENIAL—BURDEN OF PROOF.

Due process has been denied in a departmental trial board hearing when it can be objectively concluded that an impartial trial board was an impossibility because of extensive news media exposure or strong community feeling of prejudgment and when the challenger can prove the existence of such conditions; denial of due process and bias on the part of the members of a trial board is not demonstrated by proof of a half dozen sentences extracted from over 400 pages of testimony and containing apparent slips of the tongue and mild expressions of skepticism at explanations offered by the challenger because the fact that the trial board chose not to believe the challenger does not mean that it was biased against him.

13. ADMINISTRATIVE LAW—DEPARTMENTAL HEARINGS—CONSTITUTIONAL LAW—DUE PROCESS.

A departmental trial board hearing is not a trial and, therefore, need not comply with all the rules of evidence and procedure applicable to a trial; however, because a police department trial board hearing affects an "important interest", namely, the officer's employment future, the hearing must comply with "rudimentary due process".

14. ADMINISTRATIVE LAW—CONSTITUTIONAL LAW—HEARINGS—RUDIMENTARY DUE PROCESS.

"Rudimentary due process" in a departmental trial board hearing

demands: (1) timely written notice detailing the reasons for proposed administrative action; (2) an effective opportunity to defend by confronting any adverse witnesses and by being allowed to present in person witnesses, evidence, and arguments; (3) a hearing examiner other than the individual who made the decision or determination under review; and (4) a written, although relatively informal, statement of findings.

15. ADMINISTRATIVE LAW—EVIDENCE—POLYGRAPH EXAMINATIONS.

Results of polygraph examinations, even if properly admitted in administrative hearings, need not be accepted by the factfinder even when uncontradicted by another polygraph expert.

16. CRIMINAL LAW—ADMINISTRATIVE LAW—EVIDENCE—POLYGRAPH TEST RESULTS—CREDIBILITY—TRIER OF FACT.

Results of polygraph examinations are, in reality, the examiner's expert opinion as to the veracity of the individual examined by him; a police department trial board did not act arbitrarily and capriciously when it chose not to accept as conclusive the results of polygraph examinations to which the officer submitted because our jury system is grounded on the principle that all unbiased adults are competent to judge credibility and, therefore, the members of the officer's trial boards, although not polygraph experts, were competent, having heard all the testimony and seen the officer testify, to interpose their own conclusions of the officer's credibility against the opinions of the polygraph experts who testified for him.

17. CRIMINAL LAW—ADMINISTRATIVE LAW—SURVEILLANCE REPORTS— CONSTITUTIONAL LAW—RUDIMENTARY DUE PROCESS.

The evidentiary rule that surveillance reports prepared by the investigator at the end of each day from fragmentary notes taken by him may be admitted into evidence only if the investigator who prepared the report cannot testify from his present recollection and only if the report is accompanied by the fragmentary notes is applicable to administrative proceedings because the rule is premised on the right to confront and cross-examine and because rudimentary due process demands that the defending party in an administrative proceeding be given a fair opportunity to confront and cross-examine adverse witnesses.

18. CRIMINAL LAW—EVIDENCE—SURVEILLANCE REPORTS—PROSPECTIVE APPLICATION—EFFECTIVE DATE.

The evidentiary rule that surveillance reports prepared by the investigator at the end of each day from fragmentary notes

taken by him may be admitted into evidence only if the investigator who prepared the report cannot testify from his present recollection and only if the report is accompanied by the fragmentary notes is applicable only to "future cases", that is, to cases in which the relevant surveillance occurred after March 9, 1972, the date of the enunciation by the Michigan Supreme Court of the rule.

19. CRIMINAL LAW—ADMINISTRATIVE LAW—EVIDENCE—STATEMENTS.

A statement made by a police officer was properly received into evidence by a police trial board where the officer was advised prior to making the statement of his constitutional right to silence, warned that refusal to answer appropriate questions regarding conduct as a police officer would be grounds for immediate dismissal, and informed that any statement made by him and any evidence derived from such a statement could not be used in subsequent criminal prosecutions against him, since such a statement was not obtained under the false pretense of a promise of immunity but was obtained only after fully and correctly advising the officer of the applicable law.

20. CRIMINAL LAW—ADMINISTRATIVE LAW—STATUTES—EVIDENCE—IL-LEGAL WIRETAPS—TAINTED EVIDENCE—APPEAL AND ERROR.

An allegation by a police officer that evidence submitted to a police trial board was "tainted" by illegal wiretaps conducted as part of the investigation resulting in charges of misconduct against him is not sustained and the trial board's judgment will not be vacated where the police officer does not allege that he is an "aggrieved person" within the meaning of the statute to complain about the illegality of the electronic surveillance, where the officer does not indicate in any manner whatsoever just what evidence submitted against him was derived from illegal electronic surveillance, where no contents of conversation or other oral communications were submitted into evidence before the trial board, and where the evidence submitted against the officer consisted of visual observation of the actions of the officer, including observation of the fact but not the content of conversations with others, and failure of the officer to report the acts and conversations to his superior (18 USCA 2518[10][a]).

21. STATUTES—CRIMINAL LAW—EVIDENCE—ILLEGAL WIRETAPS—VIDEO TAPES.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 applies only to "wire communications" and "oral communications" and does not govern the admissibility of the video

portion of a tape whose audio portion is inadmissible as illegally obtained under the statute (18 USCA 2510[1], 2510[2]).

22. CRIMINAL LAW—ADMINISTRATIVE LAW—CONSTITUTIONAL LAW—EVIDENCE—VIDEO TAPES—REASONABLE EXPECTATION OF PRIVACY—PUBLIC TAVERNS.

The video portion of a tape of the inside of a public tavern is merely a permanent record of what any member of the general public would see if he entered the tavern as a patron and does not violate the constitutionally protected "reasonable expectation of privacy" of anyone present in the tavern; the video portion of such a tape is admissible evidence at a police trial board hearing against anyone so photographed.

23. CRIMINAL LAW—TRIAL—ADMINISTRATIVE LAW—MOTIONS—DIRECTED VERDICT—DELAYED RULING.

It is permissible in both criminal prosecutions and administrative inquiries to take under advisement motions for directed verdicts of acquittal made at the close of the prosecution's case and then deny those motions when the defendant's proof supplies necessary evidence.

24. CRIMINAL LAW—TRIAL—MOTIONS—DIRECTED VERDICT.

A motion for a directed verdict made at the close of the prosecution's case must be denied if the prosecution has presented "any evidence" in support of its case.

25. ADMINISTRATIVE LAW—FINDINGS OF FACT—SUFFICIENCY.

A finding by a police trial board of "guilty as charged" is not an exemplary finding, but it is adequate; findings of fact which recite verbatim the charges levied against an individual are, in effect, findings of "guilty as charged" and are sufficient even though they could have been made articulate.

26. ADMINISTRATIVE LAW—CRIMINAL LAW—VERDICT—FINDINGS OF FACT.

Acquittal in a police trial board hearing of a charge of knowingly and intentionally having had contact with a convicted criminal on three different dates at a specific bar does not preclude conviction of deliberately submitting false daily activity logs for those dates indicating that the officer was elsewhere than at that bar on those dates where the trial board "entertain[ed] a doubt" that the officer deliberately had contact with the convicted criminal but found the officer to have been at the bar on the specified dates and to have submitted false daily logs; contact with anyone is not an element of the latter charge.

27. ADMINISTRATIVE LAW—CONSTITUTIONAL LAW—FINDINGS OF FACT
    —EVIDENCE—SUFFICIENCY.

Determinations of fact by administrative agencies must be sustained on appeal if the determinations are supported by competent, material, and substantial evidence on the whole record (Const 1963, art 6, § 28).

28. ADMINISTRATIVE LAW—EVIDENCE—SUFFICIENCY.

A determination by a police trial board that an officer deliberately submitted a false daily activity log is supported by competent, material, and substantial evidence on the whole record and will not be disturbed where the evidence was that the officer was observed on November 17, 1970, entering a bar at 10:09 a.m. and remained until 11:14 a.m. and the log for November 17, 1970, indicated that officer left the precinct at about 10 a.m., went to the garage at headquarters for gasoline, and then engaged in general police work; the evidence presented justified the trial board in concluding that the officer spent one hour in the bar on November 17, 1970, and that he falsified his activity log for that day to obscure that fact.

29. ADMINISTRATIVE LAW—EVIDENCE—SUFFICIENCY.

A determination by a police trial board that an officer deliberately submitted a false daily activity log is not supported by competent, material, and substantial evidence on the whole record and must be reversed where the officer denied that the signature on the log for the day in question was his, a cursory comparison of the denied signature with signatures on other documents introduced in evidence against him and acknowledged by him to be genuine shows the denied signature to be very different, the officer denied that he had authorized anyone to sign the log for him, and the prosecution offered no evidence to show that the signature was that of the officer or that he had authorized anyone to sign his name for him.

30. CONSTITUTIONAL LAW—EQUAL PROTECTION—SELECTIVE ENFORCE-
    MENT.

The United States Constitution forbids the discriminatory enforcement of nondiscriminatory laws and regulations, but the conscious exercise of some selectivity in the enforcement of a law or departmental regulation is not, in itself, a violation of the Federal Constitution; to be in violation of the Constitution, the selectivity must be based upon race, religion, or some other arbitrary classification, and such discrimination will not be presumed but must be alleged and shown affirmatively (US Const, Am XIV).

31. ADMINISTRATIVE LAW—STATUTES—DISCIPLINE—PUNISHMENT.

> The Detroit Police Commissioner is charged with making all proper rules for the government and discipline of the department and is given all powers necessary for the proper discharge of his duties, and all Detroit departmental trial boards are authorized to discharge any officer convicted of misconduct or to impose such other penalty as the board may prescribe; denial of promotion, as a lesser penalty than discharge, is a proper and authorized tool for maintaining discipline in the department (Detroit Charter, Title 4, ch 21, §§ 5[a], 5[m], 16).

32. ADMINISTRATIVE LAW—CONSTITUTIONAL LAW—DISCIPLINE—PUNISHMENT.

> Denial of promotion is not out of proportion to the misconduct done by a police officer in filing false activity logs and does not violate either the Federal or Michigan Constitutions because such conduct by an officer compromises the integrity of the police department; the public is entitled to infer that when a police officer deliberately conceals from his superiors his activities while on duty those activities are improper, and unless the public is convinced that its police officers scrupulously obey the rules and regulations of the department, it cannot be certain that its officers will obey the constitutions and laws they are charged with enforcing.

Appeals from Wayne, James Montante, J. Submitted Division 1 April 12, 1973, at Detroit. (Docket Nos. 15396, 15397, 15398.) Decided August 29, 1973.

Complaints by Sgt. Gerald Sponick, Sgt. Cyril Rickard, and Sgt. Roy Daugherty for an order of superintending control against the Detroit Police Department, its Commissioner, and members of its trial board. Complaints dismissed. Plaintiffs appeal by leave granted. Affirmed in part, reversed in part, and remanded as to plaintiffs Sponick and Rickard. Reversed as to plaintiff Daugherty.

*Armand D. Bove,* for plaintiff Sponick.

*Harrison, Friedman & Roberson,* for plaintiffs Rickard and Daugherty.

*Michael M. Glusac,* Corporation Counsel, and *John E. Cross* and *Maureen P. Reilly,* Assistants Corporation Counsel, for defendants.

Before: BRONSON, P. J., and R. B. BURNS and VAN VALKENBURG,* JJ.

R. B. BURNS, J. Appellants, three Detroit police officers, were disciplined, after hearings before separate departmental trial boards, for various violations of the rules and regulations of the Detroit Police Department. Each officer sought review of the disciplinary action taken against him by filing in the Wayne County Circuit Court a complaint for an order of superintending control directed against appellees. In each case the circuit court refused to issue the order, thus affirming the trial boards. This Court granted each appellant's application for leave to appeal and, on its own motion, ordered the cases consolidated.

The facts will be detailed as pertinent to our discussion of the several claims of error advanced by appellants.

## I. THE CHARGES AGAINST APPELLANTS

Sergeant Gerald R. Sponick was found guilty of all four charges of misconduct levied against him. Specification I: knowingly submitting a false daily log for his activities while on duty on November 17, 1970, in violation of Detroit Police Manual, ch 3, § 34(21). Specification II: conduct unbecoming an officer in that he did "knowingly and intentionally

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

have contact on November 17, 1970, November 20, 1970, and December 4, 1970, with a convicted criminal", in violation of Detroit Police Manual, ch 3, § 34(8). Specification III: "knowingly and intentionally associat[ing] with a convicted criminal" on March 12, 1971, and April 30, 1971, in violation of Detroit Police Manual, ch 3, § 34(41). Specification IV: neglect of duty in that he failed to timely report "knowingly and intentionally hav-[ing had] contact on March 12, 1971, and April 30, 1971, with a convicted criminal", in violation of Detroit Police Manual, ch 4, § 73, and ch 3, § 34(10). The involved provisions of the Detroit Police Manual are reproduced in the margin.[1]

---

[1] Detroit Police Manual, ch 3, § 34(8) provides:

"Conduct unbecoming an officer, which shall include any act or conduct not specifically mentioned in the rules and regulations which tends to bring the department into disrepute or reflects discredit upon the individual as an officer."

Detroit Police Manual, ch 3, § 34(41) provides:

"Knowingly and intentionally associating with (unless in the course of their official duties): convicted criminals or persons charged with crimes excluding traffic and municipal ordinance violations; or persons known or suspected of criminal offenses of any type, including subversive activities which tend to jeopardize the security of the government."

Detroit Police Manual, ch 4, § 73 provides:

"Each time any member knowingly and intentionally has contact with or goes to a location frequented or suspected of being frequented by:

1. Convicted criminals or persons charged with crimes excluding traffic and municipal ordinance violations: or

2. Persons known or suspected of criminal offenses of any type, including subversive activities which tend to jeopardize the security of the government;

an information report shall be prepared in duplicate on a PCR within 24 hours, unless such contact or visit is properly recorded on a routine report such as activity log, interrogation sheet, routine PCR or other official department record.

"When an information report is prepared, both copies shall be forwarded to the commanding officer of the Inspectional Services Bureau. If the member preparing the report wishes to keep the information confidential, he may personally convey the report to the commanding officer of the Inspectional Services Bureau. Failure to follow the above procedures shall be considered neglect of duty."

Two charges of misconduct were levied against Sergeant Cyril Rickard. Specification I: knowingly submitting false daily logs for his activities while on duty on February 5, 1971, March 4, 1971, and April 2, 1971, in violation of Detroit Police Manual, ch 3, § 34(21). Specification II: failing to timely report "knowingly and intentionally hav[ing had] contact on February 5, 1971, March 4, 1971, and April 2, 1971", with a convicted criminal, in violation of Detroit Police Manual, ch 4, § 73, and ch 3, § 34(10). Sergeant Rickard was found guilty of Specification I, but not guilty of Specification II.

Two charges of misconduct were also filed against Sergeant Roy A. Daugherty. Specification I: neglect of duty in that he failed to timely report "knowingly and intentionally hav[ing had] contact on February 17, 1971, with a convicted criminal", in violation of the Detroit Police Manual, ch 4, § 73, and ch 3, § 34(10). Specification II: conduct unbecoming an officer in that he "did, while on duty on May 20, 1970, knowingly and intentionally have contact with a convicted criminal", in violation of the Detroit Police Manual, ch 3, § 34(8). Sergeant Daugherty was found guilty of both specifications.

Sergeant Sponick claims that the charges against him are premised on unconstitutional rules and regulations.

## A. Conduct Unbecoming An Officer

It is our opinion that the regulation proscribing "conduct unbecoming an officer" is too vague to be valid. We base our holding on the cases of *Avrech v Secretary of the Navy,* 155 US App DC 352; 477 F2d 1237 (1973); and *Hamtramck Civil Service Commission v Pitlock,* 44 Mich App 410; 205 NW2d 293 (1973).

In *Avrech v Secretary of the Navy, supra,* at 355, 356; 477 F2d at 1241, the Circuit Court of Appeals for the District of Columbia, in an opinion authored by Mr. Justice Clark, struck down Article 134 of the Uniform Code of Military Justice, 10 USCA 934, which article imposes criminal sanctions on "all disorders and neglects [not specifically mentioned in this chapter] to the prejudice of good order and discipline in the armed forces" and "all conduct of a nature to bring discredit upon the armed forces". Article 134 was struck down because it "gives no fair warning of the conduct it proscribes and fails to provide any ascertainable standard of guilt to circumscribe the discretion of the enforcing authorities". The analysis applied to Article 134 is equally applicable to that regulation of the Detroit Police Department which proscribes all conduct "not specifically mentioned in the rules and regulations which tends to bring the department into disrepute or reflects discredit upon the individual as an officer". See also *Levy v Parker,* 478 F2d 772 (CA 3, 1973).

In *Hamtramck Civil Service Commission v Pitlock, supra,* 413–414; 205 NW2d at 294–295, a panel of this Court, in an opinion authored by Judge, now Justice, LEVIN, ordered one Robert Pitlock reinstated to his position with the City of Hamtramck. Pitlock had been discharged because his act of driving a city truck at a time when his driver's license had been suspended was deemed "conduct unbecoming an officer or employee of the city", in violation of Rule XII, § 5 of the Hamtramck Civil Service Rules and Regulations. It was held by this Court that a "rule proscribing 'conduct unbecoming an officer or employee of the city' presents a standard or guide so impalpable as to be no standard at all" and, as such, is not in

compliance with that provision of the Hamtramck City Charter authorizing the civil service commission to "adopt and amend rules and regulations". Detroit Police Manual, ch 3, § 34(8), is no more certain a standard and, therefore, is not a valid exercise of the Police Commissioner's authority to "make all proper rules for the government and discipline" of the department. Detroit Charter, Title 4, ch 21, § 5(a).

Accordingly, we hold that Specification II against Sergeant Sponick and Specification II against Sergeant Daugherty must be, and are hereby, dismissed.

A contrary holding is not required by those decisions of our Supreme Court affirming the discharge of a police officer because of conduct unbecoming an officer. See *Purdie v Detroit Police Department Trial Board,* 318 Mich 430; 28 NW2d 283 (1947), and *Aller v Detroit Police Department Trial Board,* 309 Mich 382; 15 NW2d 676 (1944). In neither of those cases was there a challenge to the propriety of the regulation which prohibited conduct unbecoming an officer. Therefore, the decisions of the Supreme Court should not be read as upholding the regulation.

## B.  Associating With Criminals

### 1.

It is further claimed by Sergeant Sponick that the regulation which prohibits associating with convicted or suspected criminals is also unconstitutionally vague. He cites *DeGrazio v Chicago Civil Service Commission,* 31 Ill 2d 482; 202 NE2d 522 (1964). We disagree.

Detroit Police Manual, ch 3, § 34(41), does not have the defects of uncertainty found in Rule 309 of the Chicago Police Department. The Detroit

rule proscribes knowing and intentional associa-
tion, except in the line of duty, with persons
convicted, charged, or suspected of any crime other
than traffic offenses and municipal ordinance vio-
lations. Thus, it can be readily ascertained from
the face of the regulation that arrest and convic-
tion records are included within the meaning of
the regulation, that all felonies and many misde-
meanors are also included, and that a single arrest
or conviction constitutes a "criminal record". Since
only knowing and intentional associations are pro-
scribed, it is readily apparent that the individual
officer must know that the individual has been
convicted of, is charged with, or is suspected of,
some crime. Because the regulation is so all-inclu-
sive, we think it fairly within the apparent mean-
ing of the regulation that no time limit be placed
on prior criminal activity. Finally, the word "asso-
ciate" is not an obscure term. It means more than
"incidental contacts" between police officers and
known criminals. *Cf. Arciniega v Freeman,* 404 US
4; 92 S Ct 22; 30 L Ed 2d 126 (1971). To "associate"
with a known criminal means to join with him for
a particular purpose as "a partner, fellow worker,
colleague, friend, companion or ally". *DiMarco v
Greene,* 385 F2d 556, 561 (CA 6, 1967); and *Weir v
United States,* 92 F2d 634 (CA 7, 1937), *cert den*
302 US 761; 58 S Ct 368; 82 L Ed 590 (1937), *reh
den* 302 US 781; 58 S Ct 479; 82 L Ed 603 (1938).

Therefore, it is our opinion that Detroit Police
Manual, ch 3, § 34(41) gives police officers "fair
warning" of that conduct which it proscribes. See
Section I-A of this opinion.

### 2.

However, statutes and administrative regula-
tions which are precise and which do accomplish

some legitimate governmental end are, nonetheless, unconstitutional if they "broadly stifle fundamental personal liberties when the end can be more narrowly achieved". *Shelton v Tucker,* 364 US 479, 488; 81 S Ct 247, 252; 5 L Ed 2d 231, 237 (1960); *United States v Robel,* 389 US 258; 88 S Ct 419; 19 L Ed 2d 508 (1967); *Schneider v Smith,* 390 US 17; 88 S Ct 682; 19 L Ed 2d 799 (1968); and *Grayned v City of Rockford,* 408 US 104; 92 S Ct 2294; 33 L Ed 2d 222 (1972). Sergeant Sponick claims that such is the defect of Detroit Police Manual, ch 3, § 34(41), that the regulation is "overbroad".

No one questions the authority of the Detroit Police Department to regulate the conduct, both on and off duty, of its officers in an effort to preserve the integrity of the department and of its individual officers and the public's confidence in the department. Nor does any one question the propriety of restraining police officers' associations with known or reputed criminals. Some such associations may expose an officer to irresistible temptations to yield in his obligation to impartially enforce the law, and some such associations may give the appearance that the community's police officers are not themselves honest and impartial enforcers of the law. Respect for law cannot long exist when the governed believe that the government is not obeying its own laws. *Olmstead v United States,* 277 US 438, 485; 48 S Ct 564, 575; 72 L Ed 944, 960 (1928) (dissenting opinion per Brandeis, J.). What is questioned is the propriety of banning all knowing associations by police officers, except when in the line of duty, with anyone ever arrested, convicted, or suspected, however long ago, of any crime other than a traffic offense or a municipal ordinance violation.

Freedom of association is closely allied to freedom of speech and, as such, lies at the foundation of a free society and is protected by the First and Fourteenth Amendments to the Constitution of the United States. *NAACP v Alabama,* 357 US 449; 78 S Ct 1163; 2 L Ed 2d 1488 (1958); *Shelton v Tucker, supra,* 485; 81 S Ct at 251; 5 L Ed 2d at 236; *Schneider v Smith, supra;* and *United States v Robel, supra.* That freedom may not be denied to an individual or unreasonably limited merely because he has chosen public employment as a police officer. Rather, that freedom may be circumscribed only as reasonably and narrowly related to the effective performance of a police officer's duties. *Pickering v Board of Education,* 391 US 563, 568; 88 S Ct 1731, 1734–1735; 20 L Ed 2d 811, 817 (1968); *Perry v Sindermann,* 408 US 593, 597; 92 S Ct 2694, 2697–2698; 33 L Ed 2d 570, 577 (1972), and cases cited therein.

It is our conclusion that some of the associations proscribed by Detroit Police Manual, ch 3, § 34(41) have no possible bearing on the integrity of a police officer and that of his department and no possible bearing on the public's confidence in the police. The regulation does not proscribe only association with individuals recently convicted or currently suspected of some crime. The regulation prohibits a police officer from associating with a neighbor, fellow church members, etc., arrested once decades ago. The regulation also prohibits a police officer from befriending a recently convicted individual and helping him become a productive citizen. Such associations cannot possibly impugn a police officer's integrity. Since the regulation thus unnecessarily restricts police officers' fundamental right to associate freely, that regulation is constitutionally infirm.

Undoubtedly, the Detroit Police Department has no intention of enforcing the letter of the regulation to the instances mentioned above. However, that observation only highlights the defective nature of the regulation. Both of the associations mentioned above, and numerous other obviously innocent associations, are clear violations of the regulation. Therefore, if the regulation is upheld by this Court, any police officer may be disciplined at the whim of a superior for conduct generally ignored and sometimes encouraged by the department. Such unrestricted discretion in a government agent is to be feared and is prohibited by our Constitution. *Coates v Cincinnati,* 402 US 611; 91 S Ct 1686; 29 L Ed 2d 214 (1971); *Papachristou v Jacksonville,* 405 US 156; 92 S Ct 839; 31 L Ed 2d 110 (1972).

"Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute [or regulation] may constitutionally be applied will not be heard to challenge that statute [or regulation] on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v Oklahoma,* 413 US 601, 610; 93 S Ct 2908, 2915; 37 L Ed 2d 830, 839 (1973). Were that principle without exception, Sergeant Sponick could not now challenge Detroit Police Manual, ch 3, § 34(41), for the regulation is constitutional as applied to his alleged misconduct: knowingly associating for purposes other than rehabilitation or the like with a recently convicted felon and a man currently suspected of extensive criminal activities.[2] However, because the First

---

[2] Since 1960, Sherman has been convicted of failing to purchase a gambling tax stamp (1960), willfully failing to file a Federal income tax return (1961), income tax evasion (1963), conspiracy to violate Michigan liquor laws (1966), and attempted bribery of a police officer

Amendment needs "breathing space", the traditional rules of standing have been loosened to permit—in the First Amendment area—" 'attacks on overly broad statutes [and regulations] with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite specificity' ", *Dombrowski v Pfister,* 380 US 479, 486; 85 S Ct 1116, 1121; 14 L Ed 2d 22, 28 (1965), and cases cited therein, provided that the overbreadth is "not only * * * real, but substantial as well, judged in relation to the statute's [or regulation's] plainly legitimate sweep". *Broadrick v Oklahoma, supra,* 413 US at 612, 615; 93 S Ct at 2916, 2918; 37 L Ed 2d at 840, 842. It is our conclusion that the overbreadth of the challenged regulation is very real and very substantial. In addition to legitimate restraints on a police officer's freedom of association, the regulation prohibits innocent associations with neighbors and even family members, and restrains innocent activities in church groups, fraternal organizations, civic groups, and the like. At the very least, police officers may be deterred from making associations by fear of discovering that their associates are within the proscribed class. This is not a case where the overbreadth is theoretical or limited to a handful of highly unusual and unlikely circumstances.[3]

(1966). Because Sergeant Sponick had been assigned for some time to the vice bureau and because he had been assigned to investigate a magazine article alleging connections between Sherman and the police department, it would be reasonable to conclude that Sponick was fully aware of Sherman's criminal record and the suspicions as to his criminal activities.

[3] We estimate that approximately 250,000 cases covered by the challenged regulation were commenced in this state in 1972. This figure includes criminal cases commenced in all the county circuit courts (19,027) and all felonies commenced in Detroit Recorder's Court (12,213); all misdemeanors other than traffic offenses and violations of Detroit ordinances commenced in Recorder's Court (14,-

Therefore, it is our opinion that Sergeant Sponick has standing to challenge the overbreadth of Detroit Police Manual, ch 3, § 34(41). As we have already noted, the challenged regulation is unconstitutionally broad. Accordingly, we hold that Specification III against Sergeant Sponick is premised upon an unconstitutional regulation and must be, and is hereby, dismissed.

### C. Failure To Report Contacts

### 1.

Finally, Sergeant Sponick alleges that Detroit Police Manual, ch 4, § 73, is unconstitutionally vague. We disagree.

---

968); all cases other than traffic offenses commenced in the state's district courts, minus cases bound over to circuit courts (173,230); and all cases other than traffic offenses commenced in municipal courts, minus cases bound over to circuit courts (27,143). Admittedly, some actions against one defendant for several violations have been recorded as several "cases". On the other hand, however, some actions with several codefendants have probably been recorded as a single case. We have no way of separating municipal ordinance violations out of the cases commenced in the district courts and municipal courts. However, since a defendant is not likely to know whether he was tried for an ordinance violation or a state misdemeanor (the same crime may be tried as either depending on the location of the alleged offense), to be safe a policeman is likely to assume all cases other than traffic offenses are covered by the regulation. Hence, the figure of 250,000 indicates the order of magnitude of the situation before us. Allowing for a recidivism rate of 50% within each year and 50% from year to year, approximately 0.6% of the population of this state (nine million) is involved each year for the first time with the criminal law other than traffic offenses to the point of having charges filed and not dismissed before getting to court. That means that some multiples of 0.6% of all people currently living in this state fall within the proscribed class of associates. Our statistics are from Sup Ct of Mich, *1972 Annual Report*, pp 24, 26, 36, 135, 144–145. Within racial minority neighborhoods and poverty neighborhoods, the percentage of associations within the proscribed class will be substantially higher. President's Commission on Law Enforcement & Admin of Justice, *The Challenge of Crime in a Free Society* (E. P. Dutton & Co, Inc, 1968), pp 130–133, 149–150. To obey Detroit Police Manual, ch 3, § 34(41), a minority police officer or a police officer who comes from a poverty area would have to abandon his neighborhood and his past.

Chapter 4, § 73, requires every police officer to file a written report within 24 hours of all deliberate "contacts" with persons he knows to be convicted, charged, or suspected of any crime other than minor misdemeanors, and all deliberate visits to places frequented or suspected of being frequented by such persons.

A deliberate contact is any deliberate encounter for whatever purpose, *e.g.,* an investigatory interview, an effort to obtain an individual's assistance as an informant, paying one's dues to the treasurer of a fraternal organization, or accompanying one's children to a Christmas party. "Contacts" do not involve the personal relationship inherent in "associations".

Except for the distinction between deliberate contact and deliberate association, Chapter 4, § 73, parallels Chapter 3, § 34(41). Therefore, for the reasons expressed in Section I-B(1) of this opinion it is our holding that Chapter 4, § 73, fairly informs all Detroit police officers what they must report to their superiors and when.

## 2.

However, a regulation that requires a police officer, under threat of departmental discipline, to report in writing to his superiors certain personal associations is no less obvious a restraint on that officer's personal freedom of association than is a regulation completely prohibiting those same associations. A police officer might choose to curtail his innocent involvements with others rather than publicize those involvements or rather than take the time to record all such involvements. *Cf. Shelton v Tucker, supra.* Therefore, since Detroit Po-

lice Manual, ch 4, § 73, is a restraint on police officers' freedom of association, it is constitutional only if reasonably and narrowly related to the accomplishment of some legitimate governmental objective.

The Detroit Police Commissioner defends the challenged regulation as a mechanism for gathering criminal intelligence. We do not question the legitimacy of the Commissioner's objective, nor his authority to accomplish that objective by requiring Detroit police officers to record some of their personal encounters, social as well as professional. However, because the reach of Detroit Police Manual, ch 4, § 73, is even greater than the reach of ch 3, § 34(41), *i.e.,* the former deals with encounters less than "associations", we declare that Detroit Police Manual, ch 3, § 73, is unconstitutional as presently written. See Section I-B(2) of this opinion. We are aware that a recording requirement is somewhat less of a restraint on the freedom of association than is an outright prohibition. Nonetheless, we decide as we do because Detroit Police Manual, ch 4, § 73, is considerably broader than ch 3, § 34(41), and, therefore, on balance, the constitutional infirmity of the former is comparable to that of the latter.

Since the overbreadth discussed in Section I-B(2) of this opinion is real and substantial, the overbreadth at issue in this section is even more real and substantial. Accordingly, appellants may challenge the constitutionality of Detroit Police Manual, ch 4, § 73, although as to them the regulation is constitutional.[4] *Broadrick v Oklahoma, supra.*

---

[4] As to Sergeant Sponick's awareness of Sherman's recent criminal record and currently suspected criminal activities see fn 2, *supra.* Sergeant Daugherty admitted full knowledge of Sherman's record.

## II.  APPELLANTS'[5] TRIAL BOARDS

### A.

The Detroit Charter provides that police depart-
ment trial boards "shall" consist of the Police
Commissioner or a deputy commissioner, the chief
of detectives or an assistant appointed by him, and
the chief inspector of the department. Detroit
Charter, Title 4, ch 21, § 16. Because, at the time
of the proceedings against appellants, there was no
chief inspector in the Detroit Police Department,
there obviously was no chief inspector on any of
appellants' trial boards. In the cases of Sergeants
Sponick and Daugherty the Police Commissioner
appointed a district inspector to sit in place of the
chief inspector. In Sergeant Rickard's case the
commissioner appointed the Director of Adminis-
trative Services to sit in place of the chief inspec-
tor. Sergeant Sponick claims that the absence of
the chief inspector deprived the respective trial
boards of authority to adjudicate appellants' guilt
and to discipline them. Once again, we disagree.

That same Title of the Detroit City Charter
which prescribes the membership of departmental
trial boards authorizes the Police Commissioner to
"change the titles of police officers and employees
under him, except deputies", to designate such
new titles as he sees fit, and to create "whatever
offices and positions" he deems "necessary for the
proper organization and conduct of the depart-
ment". Detroit Charter, Title 4, ch 21, § 5(d). The
commissioner also has "such other powers as * * *
may be necessary * * * for the proper discharge of
his duties". Detroit Charter, Title 4, ch 21, § 5(m).
One of his duties is the maintenance of discipline.

---

[5] Since Sections I-A and I-C(2) of this opinion require the dismissal
of both specifications against Sergeant Daugherty, for purposes of the
remainder of this opinion "appellants" are Sergeants Sponick and
Rickard.

Detroit Charter, Title 4, ch 21, § 5(a). We read these subsections of the Charter to authorize the commissioner to either abolish the office of chief inspector or to reasonably compensate for a vacancy in that office.

## B.

It is further claimed that a trial board composed exclusively of police officers cannot impartially judge charges of misconduct prosecuted against a fellow officer by the department.

The United States Supreme Court has held that administrative hearings need not be conducted by a judicial officer or even by the traditional "neutral magistrate". Due process is satisfied if the hearing is conducted by someone who did not participate in the decision under review. *Morrissey v Brewer,* 408 US 471, 486; 92 S Ct 2593, 2603; 33 L Ed 2d 484, 497 (1972); *Goldberg v Kelly,* 397 US 254; 90 S Ct 1011; 25 L Ed 2d 287 (1970). There is nothing in any of the three records before us to indicate that any of the members of appellants' trial boards participated in any way whatsoever in the investigation which led to the filing of charges against appellants or in the decision to file said charges. Therefore, the fact that appellants' trial boards were composed exclusively of police officers did not deny them due process.

Sergeant Sponick claims that allowing a police officer to sit in judgment of a fellow officer is a violation of the common-law principle that "no man shall be judge in his own cause". See *Peninsular R Co v Howard,* 20 Mich 18, 25 (1870); and *Milk Marketing Board v Johnson,* 295 Mich 644, 660; 295 NW 346, 353 (1940). Both cases are inapposite. In neither case did the Supreme Court hold that one member of a profession may not judge another member of that profession. Neither has

any subsequent case cited either the *Johnson* or *Howard* decision in support of such a holding. On the contrary, in *People v Murphy,* 364 Mich 363, 367; 110 NW2d 805, 807 (1961), our Supreme Court indicated approval of examining boards composed of members of the very profession being regulated. Rather, in *Johnson* and *Howard* the Court prohibited individuals from sitting in judgment of causes in which they had a "direct pecuniary interest". In *Johnson* the Court refused to permit milk producers and distributers to fix wholesale and retail milk prices. In *Howard* the Court refused to allow shareholders in a railroad to sit as jurors to decide a case involving the taking of private property by that railroad. There is no allegation in the instant cases that any of the members of appellants' trial boards had any financial interest in the outcome of the cases against appellants.

### C.

Failing in his first two claims of error as to the composition of his trial board, Sergeant Sponick contends that the general atmosphere within the Detroit Police Department was so charged against those implicated in the "Anchor Bar Case" that it was impossible to impanel an impartial trial board to judge him. He also claims that his trial board was, in fact, biased against him.

Due process has been denied when it can be objectively concluded that an impartial jury was an impossibility because of extensive news media exposure or strong community feeling of prejudgment. The burden of proving such conditions is on the challenger. *Sheppard v Maxwell,* 384 US 333; 86 S Ct 1507; 16 L Ed 2d 600 (1966); *People v Pearson,* 13 Mich App 371, 380; 164 NW2d 568, 573 (1968). Analogously, due process has been

denied when an impartial trial board is impossible because of pretrial publicity or strong community feeling and when the challenger can prove the existence of such conditions. Sergeant Sponick has offered no evidence to the trial board, to the circuit court, or to this Court in support of his claim of prejudgment. Therefore, we must reject that claim.

The Sergeant bases his claim of actual bias on a half dozen sentences extracted from over 400 pages of testimony. We have carefully read the entire transcript and find no indication whatsoever that the trial board was biased against Sergeant Sponick. What he claims are examples of bias appear to us to be slips of the tongue and mild expressions of skepticism at explanations offered by him. That the trial board chose not to believe Sergeant Sponick does not mean that it was biased.

Although Sergeant Rickard does not claim that his trial board was biased, we have read the entire transcript of his case and conclude that no bias whatsoever was demonstrated.

## III.  PREFACE TO ADMINISTRATIVE LAW

A departmental trial board hearing is not a trial and, therefore, need not comply with all the rules of evidence and procedure applicable to a trial. However, because a trial board hearing affects an "important interest", *i.e.,* the officer's employment future, the hearing must comply with "rudimentary due process". *Cf. Slochower v New York City Board of Higher Education,* 350 US 551; 76 S Ct 637; 100 L Ed 692 (1956). See also *Greene v McElroy,* 360 US 474; 79 S Ct 1400; 3 L Ed 2d 1377 (1959); *Sniadach v Family Finance Corp of Bay View,* 395 US 337; 89 S Ct 1820; 23 L Ed 2d 349

(1969); *Bell v Burson,* 402 US 535; 91 S Ct 1586; 29 L Ed 2d 90 (1971); *Wisconsin v Constantineau,* 400 US 433; 91 S Ct 507; 27 L Ed 2d 515 (1971); *Fuentes v Shevin,* 407 US 67; 92 S Ct 1983; 32 L Ed 2d 556 (1972).

"Rudimentary due process" demands: (i) timely written notice detailing the reasons for proposed administrative action; (ii) an effective opportunity to defend by confronting any adverse witnesses and by being allowed to present in person witnesses, evidence, and arguments; (iii) a hearing examiner other than the individual who made the decision or determination under review; and (iv) a written, although relatively informal, statement of findings. *Goldberg v Kelly, supra; Wheeler v Montgomery,* 397 US 280; 90 S Ct 1026; 25 L Ed 2d 307 (1970); *Morrissey v Brewer, supra;* and *Gagnon v Scarpelli,* 411 US 778, 786; 93 S Ct 1756, 1761–1762; 36 L Ed 2d 656, 664 (1973). See also *Dation v Ford Motor Co,* 314 Mich 152, 163; 22 NW2d 252, 256 (1946); *Napuche v Liquor Control Commission,* 336 Mich 398, 403; 58 NW2d 118, 120–121 (1953).

The remainder of this opinion will be concerned with the application of "rudimentary due process" to the proceedings under review herein.

## IV.   EVIDENCE ADMITTED

### A.

Over the objection of corporation counsel, who acted as prosecutor in these cases, the trial boards received into evidence reports of the results of polygraph examinations to which each appellant submitted. The examinations were conducted by technicians selected by appellants. Each report concluded that appellants' denials of any wrongdoing were truthful. Because no reports were submit-

ted to contradict the reports submitted by appellants and because the examiners' credentials and techniques were not challenged, it is claimed that the trial boards acted arbitrarily and capriciously when they obviously disregarded those reports by finding appellants guilty.

In this jurisdiction at present the results of polygraph examinations are not admissible at trial, either civil or criminal. *People v Frechette,* 380 Mich 64, 68; 155 NW2d 830, 832 (1968), and *Stone v Earp,* 331 Mich 606; 50 NW2d 172 (1951). Our Supreme Court has never been asked to decide whether the results of polygraph examinations may be admitted into evidence at administrative hearings, and it is not necessary for us to now decide the question. Even if properly admitted, polygraph results need not be accepted even when uncontradicted by another polygraph expert. We base our decision on *People v Cole,* 382 Mich 695; 172 NW2d 354 (1969).

The results of a polygraph examination are, in reality, the examiner's expert opinion as to the veracity of the individual examined by him. *United States v Ridling,* 350 F Supp 90, 93 (ED Mich, 1972). It cannot be seriously claimed that nonexperts are incompetent to judge veracity or credibility. Our jury system is grounded on the principle that all unbiased adults are competent to judge credibility. Therefore, the members of appellants' trial boards, although not polygraph experts, were competent, having heard all the testimony and seen appellants testify, to interpose their own conclusions of appellants' credibility against the opinions of the polygraph experts who testified for appellants. Accordingly, applying the underlying principle of *People v Cole, supra,* it is our conclusion that appellants' trial boards did not act arbi-

trarily and capriciously when they chose not to accept as conclusive the results of polygraph examinations to which appellants submitted.

## B.

The cases against appellants resulted from extensive surveillance (152 days) of two bars in the City of Detroit, the Anchor Bar and Leiter's Lounge. The surveillance, which was directed against suspected gambling activities, was conducted both in the bars and from various vantage points outside the bars by officers of the Detroit Police Department and agents of the Federal Bureau of Investigation. The surveillance was not directed against appellants. However, when the officers and agents on surveillance duty compared their notes, they became aware that several Detroit police officers, including appellants, were frequent visitors to both bars and appeared to be friendly with the primary object of the surveillance, one Charles Sherman, a man convicted of several felonies and suspected of extensive gambling activities. This information was relayed to appellants' superiors and, after additional internal investigations, resulted in the filing of charges of misconduct.

While on surveillance duty the officers made fragmentary notes of their observations. Subsequently, detailed reports were prepared using the fragmentary notes, and then the notes were destroyed. At appellants' trial board hearings the police officers and FBI agents who conducted the surveillance testified against appellants, admittedly basing their testimony on the reports prepared by them from their fragmentary notes. Some of these witnesses candidly admitted having no independent recollection of either the incidents

or the dates detailed in their reports. Others claimed to have independent recollections of the incidents, but not of the dates, detailed in their reports. None of the witnesses had independent recollections of both incidents and dates. It is obvious from the specifications against appellants that the establishment of particular dates is essential to the cases against them. See Section I of this opinion. Appellants' counsel objected to all testimony based on written reports when the witness had no independent recollection of the subject of his testimony, and could not produce his fragmentary notes, citing *People v Rosborough,* 387 Mich 183; 195 NW2d 255 (1972). Appellants renew here their objections based on *Rosborough.* Corporation counsel claims now, as he claimed successfully at the trial board hearings, that *Rosborough* is inapplicable to the instant cases because they are administrative proceedings.

It is our opinion that the *Rosborough* decision is applicable to administrative proceedings in general, but is not applicable to the particular proceedings under review herein.

In *People v Rosborough, supra,* 194–195; 195 NW2d at 261, our Supreme Court held that a surveillance report prepared from fragmentary notes may be admitted into evidence only if the officer who prepared the report cannot testify from his present recollection and only if the report is accompanied by the fragmentary notes. The Court perceived such an evidentiary rule as the only way to enable counsel for a defendant "to proceed with a meaningful cross-examination of the officer". Rudimentary due process demands that the defending party in an administrative proceeding be given a fair opportunity to confront and cross-examine adverse witnesses. *Goldberg v Kelly,* 397 US

254, 267–268; 90 S Ct 1011, 1020; 25 L Ed 2d 287, 299 (1970); *Wheeler v Montgomery,* 397 US 280; 90 S Ct 1026; 25 L Ed 2d 307 (1970); *Anti-Fascist Refugee Committee v McGrath,* 341 US 123; 71 S Ct 624; 95 L Ed 817 (1951) (concurring opinion per Frankfurter, J.), quoted with approval in *Wisconsin v Constantineau,* 400 US 433; 91 S Ct 507; 27 L Ed 2d 515 (1971); *Greene v McElroy,* 360 US 474; 79 S Ct 1400; 3 L Ed 2d 1377 (1959), and *Reilly v Pinkus,* 338 US 269; 70 S Ct 110; 94 L Ed 63 (1949). Since the decision in *Rosborough* was premised on the right to confront and cross-examine, it is our opinion that the evidentiary rule promulgated therein is applicable to administrative proceedings.

Nonetheless, we are constrained to hold that the *Rosborough* decision is not applicable to the instant cases because the surveillance involved was concluded before the effective date of that decision. It is our opinion that *Rosborough* applies only to fragmentary notes and reports based on surveillance occurring after March 9, 1972. All surveillance at issues herein was concluded in 1971.

The evidentiary rule announced in *People v Rosborough, supra,* 195; 195 NW2d at 261, is applicable only to "future cases". In *People v Whisenant,* 384 Mich 693, 697–702; 187 NW2d 229, 230–233 (1971), our Supreme Court devoted almost six pages of its opinion to distinguishing "trials commenced" from "cases commenced" and "prosecutions commenced". We cannot believe that, only nine months later, the same Court would use the phrase "future cases" as the equivalent of "future trials". Therefore, while we must conclude that the Court intended to give *Rosborough* prospective application, we must also conclude that the decision does not apply to all trials and administrative hearings conducted after March 9, 1972.

Although the *Whisenant* decision expressly distinguished "trials commenced" from "cases commenced" or "prosecutions commenced", that decision neither expressly distinguished "prosecutions commenced" from "cases commenced", nor did it equate the two terms. However, it is our conclusion that the Court used "future cases" in its *Rosborough* decision to mean other than "future prosecutions". Had the Court intended to limit *Rosborough* to "future prosecutions", we think it would have said so. Furthermore, the application of *Rosborough* only to "future prosecutions" would risk creating the very "anomalous situations" the Court sought to avoid in *Whisenant.*

In Michigan a criminal prosecution is commenced when a warrant is issued in good faith and delivered for execution. *People v Clark,* 33 Mich 112 (1876), quoted in *People v Whisenant, supra,* 700; 187 NW2d at 232. Analogously, a prosecution before a police trial board commences when formal charges are filed against the officer. Although the charges against appellants herein all arose out of the same 1970–1971 surveillance, charges were not levied against appellants at the same time. Sergeants Daugherty and Rickard were charged on December 20, 1971. Sergeant Sponick was not charged until March 14, 1972. Therefore, if "prosecutions commenced" is the determinative date for *Rosborough,* Sergeant Sponick's right to confront and cross-examine his accusers is significantly different than the same right of Sergeants Daugherty and Rickard to confront those same accusers.

Thus, we conclude that *People v Rosborough, supra,* is applicable only to cases in which relevant surveillance occurred after March 9, 1972. In *People v Charlie Lee Woods,* 382 Mich 128, 132–136; 169 NW2d 473, 475–477 (1969), our Supreme Court

expressed a clear preference for such a form of prospective application when police conduct and suppression of evidence are involved.

## C.

Each appellant was interrogated by the Internal Affairs Section of the Detroit Police Department. Prior to any questioning, a "Certificate of Notification of Constitutional Rights—Departmental Investigation" was handed to each appellant and thereafter read to them. That certificate advised appellants of their constitutional right to remain silent, but warned that refusal to answer appropriate questions regarding conduct as a police officer would be grounds for immediate dismissal. The certificate also advised appellants that any statements made by them and any evidence derived from such statements could not be used in subsequent criminal prosecutions against them. Each appellant acknowledged in writing that he understood his rights and was willing to answer questions put to him. Each appellant was then interrogated and their answers were transcribed. The transcripts of appellants' responses were received into evidence by the trial boards. Sergeant Rickard objected to the receipt into evidence of the transcript of his responses. He renews that objection here.

Sergeant Rickard concedes that a police trial board may receive into evidence a statement made by a police officer under threat of dismissal, provided that the statement and any evidence derived therefrom are not used against the officer in criminal proceedings. *Garrity v New Jersey,* 385 US 493; 87 S Ct 616; 17 L Ed 2d 562 (1967). Nonetheless, Sergeant Rickard claims that the statement made by him is inadmissible because obtained

under false pretenses. The Sergeant reads the Certificate of Notification of Constitutional Rights to include a promise of immunity, which promise is allegedly beyond the authority of the Detroit Police Commissioner. We do not so read the certificate. Paragraph 5 of the certificate, which paragraph is reproduced in the margin,[6] does not promise immunity. It merely states the applicable law: if a police officer makes a statement, that statement and any derivative evidence cannot be used against the officer in a criminal prosecution. Therefore, Sergeant Rickard was fully advised of the applicable law and his statement was admissible before the trial board.

### D.

In addition to visual surveillance of the Anchor Bar and Leiter's Lounge, the FBI apparently engaged in extensive electronic surveillance. With one exception, we do not know the nature of that electronic surveillance. In September, 1972, after the proceedings reviewed herein, a Federal District Judge ruled that all the electronic surveillance had been conducted without proper authorization as required by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 USCA 2516, 2518). Accordingly, he ordered suppressed all conversations intercepted and all evidence derived therefrom. *United States v Wierzbicki,* Criminal Docket #45884 (ED Mich, 1972). Wierzbicki was a Detroit police officer arrested on federal gambling charges as a result of the same investigation which resulted in charges of misconduct against appellants.

---

[6] "If I do answer, and immunity, federal, state, or other has not been given, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding."

Appellants claim that the evidence submitted against them at their trial board hearings was "tainted" by the illegal wiretaps condemned in the *Wierzbicki* decision. They ask us to vacate the discipline to which they have been subjected and to order suppressed all evidence tainted by the illegal wiretaps. We accept the decision in *Wierzbicki* as dispositive of the legality of the electronic surveillance at issue herein. We also agree with appellants that evidence obtained by means of illegal electronic surveillance may not be used, in any government proceeding, state or Federal, including police trial board hearings. 18 USCA 2515, 2518(10)(a); 1968 US Code Cong & Admin News, p 2185. However, appellants have not alleged that they are "aggrieved persons" within the meaning of 18 USCA 2510(11), 2518(10), and therefore entitled to complain about the illegality of the electronic surveillance.[7] Nor have appellants indicated to us in any manner whatsoever just what evidence submitted against them was derived from illegal electronic surveillance. No contents of conversations or other oral communications were submitted into evidence before the trial boards. We cannot imagine what evidence used against appellants at the trial board hearings could have been derived from overheard conversations. The evidence against appellants consisted of visual observations of them entering and leaving two bars, visual observations of them conversing with certain individuals inside those bars (no evidence was submitted as to the contents of those conversa-

---

[7] Had appellants been the persons at whom the electronic surveillance was directed or had appellants been parties to intercepted conversations, the Federal judge who authorized the surveillance would have notified appellants thereof. 18 USCA 2518(8)(d). Had appellants been notified that they were, in effect, *"aggrieved" persons* (18 USCA 2510[11]), we are confident appellants would have so notified us.

tions), and the failure of appellants to report such visits to the Anchor Bar and meetings therein.

In addition to having its agents inside the Anchor Bar posing as patrons, the FBI had a video tape machine located in an adjacent building. This machine photographed, apparently through a hole in the common wall, what transpired inside the bar and recorded at least some of the conversations which occurred in the bar. Sergeant Rickard appeared in one of the tapes. The trial board admitted into evidence the video portion of that tape. Because of the motion to suppress pending in Federal District Court in the *Wierzbicki* case, the trial board excluded the audio portion of the tape. Sergeant Rickard's counsel objected to receipt of even the video portion of the tape.

Because Title III of the Omnibus Crime Control and Safe Streets Act of 1968 applies only to "wire communications" and "oral communications", 18 USCA 2510(1) and (2), and 2515, the act does not apply to photographic surveillance. Therefore, the video portion of the tape showing Sergeant Rickard is inadmissible only if obtained in violation of the Sergeant's constitutional rights. We find no violation of constitutional limitations.

The Anchor Bar is a public tavern. Therefore, people in the bar must expect to be observed by those members of the public who patronize the bar. A video tape machine, insofar as it photographs only, is merely making a permanent record of what any member of the general public would see if he entered the tavern as a patron. Accordingly, to photograph Sergeant Rickard's presence in the bar did not violate his "reasonable expectations of privacy". The Fourth Amendment protects only "reasonable expectations of privacy". *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d

576 (1967). See also *Harris v United States,* 390
US 234; 88 S Ct 992; 19 L Ed 2d 1067 (1968); *Ponce
v Craven,* 409 F2d 621, 624–625 (CA9, 1969).

## V.  *RULES OF PROCEDURE*

### A.

At the conclusion of the prosecution's case Ser-
geant Sponick's counsel moved for a directed ver-
dict of acquittal. The trial board took the motion
under advisement. At the conclusion of all proofs
the motion was denied. Sergeant Sponick claims
that it was "arbitrary and unfair" for the trial
board to defer passing on his motion until the
close of the proofs, for such postponement forced
him to "risk * * * supplying missing evidentiary
elements".

In this jurisdiction trial judges in criminal prose-
cutions have long been allowed to take under
advisement motions for directed verdict of acquit-
tal and then deny those motions when the defend-
ant's proof supplies necessary evidence. *People v
Barlow,* 134 Mich 394; 96 NW 482 (1903); *People v
Garcia,* 33 Mich App 598, 601; 190 NW2d 347, 349
(1971); and *People v Qualls,* 9 Mich App 689, 697;
158 NW2d 60, 64–65 (1968). If such is permissible
in criminal prosecutions, it certainly is permissible
in administrative inquiries.

Furthermore, a motion for directed verdict made
at the close of the prosecution's case must be
denied if the prosecution has presented "any evi-
dence" in support of its case. *People v Wesley
Brown,* 35 Mich App 153, 155; 192 NW2d 281, 282
(1971); *People v Garcia, supra.* In Sergeant Spon-
ick's case the evidence presented by the prosecu-
tion justified the trial board's finding of miscon-
duct. Accordingly had the trial board ruled on

Sergeant Sponick's motion when made, it would have been justified in denying that motion. As a matter of fact, given the evidence presented by the prosecution, it would have been error to grant the motion. Therefore, denying the motion at the close of all proofs was not error.

### B.

Sergeant Sponick's trial board found him "guilty of all four * * * specifications * * * as formally charged before this Panel". Sergeant Daugherty was found "guilty of both * * * specifications * * * as formally charged before the Board". Sergeant Rickard was found "not guilty of the offenses described in specification 2", but "guilty of those offenses enumerated in specification 1". Sergeant Rickard's trial board explained why they found him guilty of specification I. No explanations were offered by Sergeant Sponick's trial board or by Sergeant Daughterty's trial board. Sergeant Sponick complains that a finding of "guilty as charged" is not an adequate finding of fact. We disagree. A finding of "guilty as charged" is not an exemplary finding, but it is adequate. We base our decision on the case of *Viculin v Department of Civil Service,* 386 Mich 375; 192 NW2d 449 (1971).

Donald Viculin was an examiner with the Vocational Rehabilitation Division of the Michigan Department of Education. Because of two consecutive "unsatisfactory" service ratings, Viculin was dismissed by his immediate superiors. He appealed the dismissal to the Civil Service Hearing Board. Formal charges were filed against Viculin before the hearing board, a hearing was held, findings were made, and the dismissal was affirmed. The board's findings of fact recited verbatim the

charges filed before the board. The charges filed and the findings made are reproduced in the margin.[8] Viculin then appealed to the Civil Service Commission. Another hearing was held. Viculin was informed by letter by the commission that it "affirmed the Hearing Board's decision". On appeal to the Supreme Court Viculin complained that the findings of the Civil Service Hearing Board and those of the Civil Service Commission were inadequate. The Supreme Court affirmed, holding that the "findings" were "sufficient", although the board and the commission "could have been more articulate in presenting their findings and the basis for their decisions". *Viculin v Department of Civil Service, supra,* 405–406; 192 NW2d at 465. See also *Martin v Wayne County Civil Service Commission,* 16 Mich App 536, 538, 540–541; 168 NW2d 419, 420, 421 (1969).

Findings of fact which recite verbatim the

[8] The following charges were lodged against Donald Viculin (See *Viculin v Department of Civil Service,* 386 Mich 375; 192 NW2d 449 [1972], Appellant's Appendix, p 144a):

"1) Unnecessary long delays of cases * * *
"2) Lack of response to supervisor's help * * * .
"3) Gross errors in case action * * * .
"4) Carelessness in routine work * * * .
"5) Poor case management at desk * * * .
"6) Inability to acknowledge mistakes * * * .
"7) Poor handling of invoices * * * ."

The asterisks above represent references to memoranda stating the particulars of each specification against Viculin.

The Civil Service Hearing Board made the following "findings" *(Viculin v Department of Civil Service, supra,* 382; 192 NW2d at 453):

" '1. Unnecessary long delays of cases.
" '2. Lack of response to supervisor's help.
" '3. Gross errors in case action.
" '4. Carelessness in routine work.
" '5. Poor case management at desk.
" '6. Inability to acknowledge mistakes.
" '7. Poor handling of invoices.' "

The Civil Service Commission adopted as its own the findings of the Civil Service Hearing Board.

charges levied against an individual are, in effect, findings of "guilty as charged". Therefore, on the basis of the *Viculin* decision, we hold that the findings of fact made by Sergeant Sponick's trial board "could have been more articulate", but were "sufficient".

## VI. SUFFICIENCY OF THE EVIDENCE

### A.

Sergeant Rickard was found not guilty of failing to timely report "knowingly and intentionally hav-[ing had] contact on February 5, 1971, March 4, 1971, and April 2, 1971", with a convicted criminal (Specification II). However, he was found guilty of having deliberately submitted false daily activity logs (Specification I) in that his daily logs for February 5, 1971, March 4, 1971, and April 2, 1971, indicated that he was elsewhere than the Anchor Bar on those dates at times when the trial board determined that he was, in fact, in the Anchor Bar. Sergeant Rickard claims that implicit in his acquittal on Specification II are findings of fact which necessitate acquittal on Specification I. We disagree.

Specification II charged Sergeant Rickard with having been in the Anchor Bar on certain dates, and having had contact while there with a named individual, and with having failed to report said contacts. The Sergeant was acquitted of the specification because the trial board "entertain[ed] a doubt" that Rickard deliberately had contact with the named individual. The board did not find that he was never in the bar. Specification I merely charged the Sergeant with having been in the Anchor Bar on the same dates specified in Specification II and with having submitted daily logs

indicating he was elsewhere. Contact with anyone is not an element of Specification I. Therefore, acquittal on Specification II did not preclude conviction on Specification I.

## B.

Each appellant claims that the trial boards' findings of misconduct are not supported by the evidence.

We must sustain challenged determinations of fact by administrative agencies if those determinations are supported by "competent, material and substantial evidence on the whole record". Const 1963, art 6, § 28; *Viculin v Department of Civil Service, supra,* 403; 192 NW2d at 464. We do not now detail the adequate factual bases for Specifications II, III, and IV against Sergeant Sponick, and Specification I and II against Sergeant Daugherty, for we have ordered those specifications dismissed because premised on defective regulations. We will set forth the factual bases for only those specifications not premised on defective regulations. With a single exception to be explained below, we find all the remaining findings of misconduct "supported by competent, material and substantial evidence on the whole record".

### 1. Case #15396

*Specification I.* Detroit police officers and FBI agents on surveillance duty outside the Anchor Bar on November 17, 1970, observed Sergeant Sponick enter the bar at 10:09 a.m. and remain therein until 11:14 a.m. Sergeant Sponick's activity log for November 17, 1970, makes no mention of the one hour spent in the Anchor Bar. Rather, the log shows Sergeant Sponick leaving the pre-

cinct at about 10 a.m., going to the garage at headquarters for gasoline, and then engaging in general police work. The trial board was justified in concluding that Sergeant Sponick spent one hour in the Anchor Bar on November 17, 1970, and that he falsified his activity log for that day to obscure that fact.

### 2. Case #15397

*Specification I.* Testimony by police officers on surveillance duty outside the Anchor Bar placed Sergeant Rickard inside the Bar on February 5, 1971, from 9:23 a.m. until 11:13 a.m.; on March 4, 1971, from 9:01 a.m. until 10:31 a.m.; and on April 2, 1971, from 9:07 a.m. until 9:40 a.m. Sergeant Rickard did not contest this evidence.

Daily logs purporting to be those of Sergeant Rickard for the dates at issue were then submitted into evidence. Sergeant Rickard identified as his own the signatures appearing on the logs for February 5th and April 2nd. He denied that the signature on the log dated March 4th was his. A cursory comparison of the logs for February 5th and April 2nd with the log for March 4th indicates that the signatures thereon are very different. Because Sergeant Rickard refused to admit that the signature on the log for March 4th was his or that he had authorized anyone to sign the log of March 4th for him, and because the prosecution offered no evidence that the signature on the March 4th log was the signature of Rickard or that Rickard had authorized anyone to sign his name for him, we must conclude that the prosecution failed to prove its case as to March 4th. However, adequate proof was submitted as to February 5th and April 2nd.

The trial board was entitled to infer that the

logs for February 5th and April 2nd were false. Sergeant Rickard's log for February 5, 1971, shows him arriving in the office at 8 a.m. and doing miscellaneous office work until 10:15 a.m., at which time he left the office and visited one George Wright about some charitable solicitation, had lunch, visited some recruiting office, and then observed labor pickets beginning at approximately 2:45 p.m. According to his log Sergeant Rickard did not spend any time on February 5, 1971, in the Anchor Bar. The evidence suggested the contrary. The Sergeant's log for April 2, 1971, shows the Sergeant arriving on duty at 7:45 a.m. and doing miscellaneous office work until 10 a.m., at which time he left for the City Clerk's office. At approximately 10:30 a.m. Rickard attended a union meeting. At 12:30 p.m. Rickard and his partner checked into their offices and then went to lunch. According to a fair reading of this log Rickard spent no time in the Anchor Bar. The trial board was entitled to infer from the evidence that such was false.

## C.

At his trial board hearing Sergeant Sponick presented some evidence to the effect that scores of Detroit police officers were lax in the preparation of daily logs and other required reports, but were not prosecuted. He claimed then, and claims now, that pressing charges against him and a handful of other officers was unfair in light of such widespread unpunished laxity.

The United States Constitution forbids the discriminatory enforcement of nondiscriminatory laws and regulations. However, the conscious exercise of some selectivity in the enforcement of a law or departmental regulation is not, in itself, a

violation of the Federal Constitution. In order to be a violation of the Constitution, the selectivity must be based upon race, religion, or some other arbitrary classification. Intentional or purposeful discrimination will not be presumed; it must be shown affirmatively. *Oyler v Boles,* 368 US 448; 82 S Ct 501; 7 L Ed 2d 446 (1962); *Snowden v Hughes,* 321 US 1; 64 S Ct 397; 88 L Ed 497 (1944); *Society of Good Neighbors v Mayor of Detroit,* 324 Mich 22; 36 NW2d 308 (1949); *People v Gillespie,* 41 Mich App 748, 750–751; 201 NW2d 104, 105 (1972); *People v Sawicki,* 4 Mich App 467, 476–477; 145 NW2d 236, 240–241 (1966). No showing of intentional discrimination has been made in the instant cases. There has not even been an allegation of such discrimination.

## *VII. DISCIPLINE*

The trial board which found Sergeant Sponick guilty as charged demoted him to the rank of patrolman, and ordered that he not be considered for promotion from the then current eligible register or from the next register. In effect, Sergeant Sponick was denied promotion for four years. Sergeant Rickard's trial board ordered him to forfeit five leave days and further ordered that he not be considered for promotion from the then current eligible register.

Sergeant Sponick claims that the Police Commissioner has no authority to deny promotion to any police officer who has taken and passed the qualifying examinations. He also claims that denying promotion is so disproportionate to the misconduct of which he was convicted as to be cruel and unusual punishment. The circuit judge who reviewed these cases thought that the discipline ordered against appellants was harsh. He re-

manded the cases with the suggestion that the severity be mitigated. However, he felt himself without authority to order such mitigation. Apparently, the commissioner rejected the circuit judge's suggestion.

Because, upon remand, Sergeant Sponick is to be disciplined for substantially less misconduct than that for which he was originally disciplined, the new discipline may be different than that complained of. Were Sergeant Sponick's case the only one before us, we would decline to consider his challenge to the discipline imposed on him as a potentially unnecessary resolution of a constitutional issue. However, Sergeant Rickard, who was also denied promotion, is to be disciplined anew for essentially the same misconduct for which he was originally disciplined. The likelihood of promotion again being denied to Sergeant Rickard is substantial. Therefore, as guidance to Sergeant Rickard's trial board and in hopes of precluding another appeal, we will consider the challenges made against denial of promotion as a form of discipline.

The Police Commissioner is charged with making "all proper rules for the government and discipline" of the department, Detroit Charter, Title 4, ch 21, § 5(a), and is given all powers "necessary * * * for the proper discharge of his duties". Detroit Charter, Title 4, ch 21, § 5(m). To withhold from the commissioner authority to deny promotion as discipline for misconduct is to deny him an effective tool for discharging his duty to properly discipline the department.

Finally, all departmental trial boards are authorized to discharge any officer convicted of misconduct or to impose such "other penalty as the board may prescribe". Detroit Charter, Title 4, ch 21, § 16. If a trial board may discharge an errant

officer from the force, it certainly can impose a lesser penalty, including forfeiture of leave or pay, denial of promotions, etc.

By filing false activity logs a police officer compromises the integrity of the Detroit Police Department. The public is entitled to infer that, when a police officer deliberately conceals from his superiors his activities while on duty, those activities are improper. Unless the public is convinced that its police officers scrupulously obey the rules and regulations of the department, the public cannot be certain that its police officers will obey the constitutions and laws they are charged with enforcing. Accordingly, denial of promotion is not out of proportion to such misconduct and does not violate either the Federal Constitution or the Constitution of this state. *People v Lorentzen,* 387 Mich 167, 172, 174–176; 194 NW2d 827, 829, 830–831 (1972).

## VIII.   CONCLUSION

Specifications II, III, and IV against Sergeant Sponick are dismissed. The trial board's finding of fact as to Specification I is affirmed. The case is remanded to the original trial board for reconsideration of discipline. If the original trial board cannot be convened, the commissioner shall appoint another board to reconsider discipline. If a new board must be convened, it shall include as many of the members of the original board as are still with the Detroit Police Department.

The trial board's findings of fact as to Specification I against Sergeant Rickard are affirmed, except as to the charge of filing a false activity log for March 4, 1971. That one charge is dismissed. The case is remanded for reconsideration of disci-

pline. If possible, the original trial board shall reconsider the discipline to be imposed on Sergeant Rickard. If the original board cannot be convened, the commissioner shall act as ordered above.

Specifications I and II against Sergeant Daugherty are dismissed. Sergeant Daugherty is to be fully reinstated and promoted to the rank of lieutenant, effective the date he would have been so promoted were it not for these proceedings.

Case #15396: Affirmed in part; reversed in part. Remanded.

Case #15397: Affirmed in part; reversed in part. Remanded.

Case #15398: Reversed.

All concurred.